J-S47013-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| ANGELA M. DILWORTH | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| JOHN H. DILWORTH | : | |
| | : | |
| Appellant | : | No. 2242 EDA 2025 |

Appeal from the Order Entered July 31, 2025
In the Court of Common Pleas of Delaware County
Civil Division at No(s):  CV-2023-006819

BEFORE:  PANELLA, P.J.E., OLSON, J., and BECK, J.

MEMORANDUM BY PANELLA, P.J.E.:                    **FILED MARCH 6, 2026**

John H. Dilworth ("Father") appeals from the final custody order entered on July 31, 2025, in the Delaware County Court of Common Pleas, granting the petition filed by Angela Dilworth ("Mother") to relocate with the parties' three children to Bergen County, New Jersey.  The order further awarded Mother primary physical custody during the school year and Father partial physical custody, and it reversed the custody awards during the summer months.  Upon review, we affirm.

The record reveals that Mother initiated the child custody action against Father in December of 2023, with respect to the parties' eight and nine-year-old sons, J.D. and C.D., and their four-year-old daughter, E.D.  At that time, pursuant to an agreed-upon order for exclusive possession, Father moved out of the marital residence in Havertown, Delaware County, after eleven years of

marriage, and into his parents' home in Drexel Hill, Delaware County, where he remained at the time of the subject proceedings. *See* Trial Court Opinion, 9/22/25, at 2; *see also* N.T., 7/10/25, at 286.

The interim custody order in effect throughout the underlying proceedings was issued on January 19, 2024, following a hearing before a custody officer. The order awarded Mother primary physical custody, Father partial physical custody, and the parties shared legal custody. Pursuant to the interim order, Father exercised custody on alternating weekends and every Wednesday from 3:00 p.m. until 7:30 p.m. *See* N.T., 7/10/25, at 317.

A brief discussion about the procedural and factual history of this custody action is necessary. The parties' relationship is acrimonious, and they have engaged in protracted litigation leading up to the final custody order on appeal. For instance, on January 2 and January 30, 2024, Mother filed Protection from Abuse ("PFA") petitions against Father, the first of which she withdrew, and the second the court dismissed. The trial court found that, by April of 2024, "many petitions were filed, mostly by Mother. These petitions mostly requested special relief or for findings of contempt against Father." Trial Court Opinion, 9/22/25, at 3. There is no dispute that Mother's petitions were unsuccessful against Father.[1]

_____

[1] In addition to filing various petitions, Mother twice reported Father to children and youth services after their separation, which were ultimately deemed unfounded. *See* N.T., 7/10/25, at 288-293. Further, Father alleged
*(Footnote Continued Next Page)*

The subject order arises from Mother's notice of proposed relocation, filed on March 8, 2024, which omitted a proposed new address. Nevertheless, Father timely filed a counter-affidavit objecting to the relocation. On March 26, 2024, Mother filed a petition for relocation, requesting to relocate with the children to "northern New Jersey," to which Father filed an answer on April 4, 2024, opposing the relocation. Petition, 3/26/24, at ¶ 6.

The Honorable William C. Mackrides presided over the first day of the custody and relocation trial on July 16, 2024. Mother, who testified on direct and cross examination, was the only witness to testify on this date. In addition, Mother introduced thirty-one exhibits, which the court admitted into evidence. Father introduced ten exhibits, which the court also admitted. The custody trial did not conclude on that date.

Approximately two weeks later, Mother filed another PFA petition against Father, which the trial court ultimately dismissed, along with an emergency petition to relocate, which the court denied. In September of 2024, Judge Mackrides ordered the parties to obtain a custody evaluation from Kevin Masturzo, LCSW. The parties complied, and Mr. Masturzo completed his report on April 2, 2025.

The second and final day of the trial was held on July 10, 2025. Because judicial reassignments in the Delaware County Court of Common Pleas had

---

that Mother reported him to the police seventeen times after their separation, however, the police never arrested him. *See id.* at 311.

- 3 -

occurred in the interim, the Honorable Rachel Ezzell Berry presided over the continuation of the custody trial. Mr. Masturzo, Mother, and Father testified. Father also presented the testimony of Adam Molineux, a neighbor whose sons are friends and baseball teammates with the parties' sons. The court admitted Mr. Masturzo's custody report as Exhibit C-1; three exhibits on behalf of Father; and one more exhibit on behalf of Mother. In addition, the court interviewed C.D., J.D., and E.D. collectively *in camera*.

In its opinion that accompanied the final custody order, the trial court set forth 391 factual findings which are supported by the testimonial and documentary evidence. ***See*** Trial Court Opinion, 7/31/25, at ¶¶ 1-391. We now summarize the relevant evidence from the custody trial as follows.

Mother testified that she desired to relocate with the children to Bergen County, New Jersey, which is approximately a two-hour drive from Delaware County, because it is where she was raised, and her mother, sister, brother, and lifelong friends reside in or near the county. ***See id.*** at ¶¶ 150-151; ***see also*** N.T., 7/16/24, at 12. In addition, Mother explained that she has a unique lease-to-buy opportunity for a house with a fair market value of $740,000 in Waldwick, Bergen County ("Waldwick house"). ***See id.*** at ¶ 157. Specifically, the owner of the house is a man whom she has known most of her life and with whom she was in a "casual relationship." ***Id.*** at ¶ 155. Mother testified he would accept a purchase price of $200,000 for the house. ***See id.*** at ¶ 157. Mother testified that the lease-to-purchase offer did not have an

expiration date. *See* N.T., 7/16/24, at 97. Mother described the Waldwick house as 3,000 square feet and has "a large fenced-in yard" with a pool. *Id.* at 74-75.

In contrast, the marital residence is 1600 square feet, and the parties planned to sell it as part of the divorce proceedings. *See* N.T., 7/16/24, at 74. Mother alleged that the marital residence is not safe because of electrical issues. *Id.* at 71-72. Mother testified that, in Delaware County, she would be able to afford a house only in Upper Darby, which she described as mostly "row homes, no yard, older, more run down, less space for the kids. . . ." *Id.* at 85-86.

Mother explained that the owner of the Waldwick house "is aware of [her] situation" and "is very willing to help" in this way. *Id.* at 118. She stated that he "owns multiple properties. He is also a Marine who has helped his fellow Marines [who have come] back from deployment. . . . He has given them houses. . . ." *Id.* at 117.

Further, Mother testified that Waldwick is ranked "in the top three towns" in New Jersey for public school excellence. N.T., 7/16/24, at 81. She testified that Crescent Elementary, where the children would attend public school, is ranked in the 8th percentile in New Jersey. *See id.*; *see also* Exhibit P-28. Further, Mother testified that Crescent Elementary has "a 16 to 1 student-teacher ratio." *Id.*

By July of 2024, the date of the first hearing, Mother had accepted a high school English teaching position in the Paramus School District, located in Bergen County, for the 2024-2025 school year, which included a $9000 salary increase from her teaching position in the Garnet Valley School District in Delaware County. *See* N.T., 7/16/24, at 119. Mother testified that she was hired "at a higher step" than what she held in the Garnet Valley School District, and that her salary "would cap out sooner" in the Paramus School District. *Id.* at 78. She stated, "I think it's seven years sooner" than in the Garnet Valley School District. *Id.*

By July of 2025, the last day of the trial, the marital residence had not been sold by the parties insofar as equitable distribution in the divorce matter was still pending.[2] Mother testified that the children had remained in their same parochial elementary school in Havertown during the last school year, and she had commuted daily to and from the marital residence to the Paramus School District for work. *See* N.T., 7/10/25, at 259. Besides teaching English, Mother was then enrolled in a post-graduate program to become a principal or an administrator in the Paramus School District, which would increase her salary. *See* Trial Court Opinion, 7/31/25, at ¶¶ 169-170. Mother testified, "They want me to be an administrator in that district." N.T., 7/10/25, at 186.

_____

[2] The record does not reveal whether the parties' divorce was bifurcated or whether a decree of divorce had been entered by the time of the custody trial.

Father testified that Mother always took the children to Bergen County during her custodial weekends and when their elementary school was not in session during the week. *See id.* at 352. To this point, Father testified that Mother did not permit the children to attend birthday parties or participate in extracurricular sports in Delaware County that occurred during her primary physical custody time. *See id.* at 332-334. Mother agreed that, since the school year came to an end, she spends most of her time in New Jersey, where the children participate in a sports camp. *See id.* at 254.

Father testified that, throughout the underlying proceedings, Mother never agreed to his requests for additional time with the children outside the parameters of the interim custody order. *See* N.T., 7/10/25, at 321-329. For example, Father testified that J.D. played baseball in the past year on Wednesday evenings in Havertown, during Father's custody time which was from 3:00 p.m. to 7:30 p.m. One evening J.D. had a baseball game from 6:00 p.m. to 8:00 p.m.. Father explained, "you can't start a new inning after 7:45. So I asked [Mother] . . . can [J.D.] just finish this game? It'll be 15 extra minutes? No. So we ended up having to leave that game early." *Id.* at 321.

Further, Father testified that Mother has "purposely limited" his "access" to the children. *Id.* at 353. However, Father does not claim that Mother failed to abide by the interim order; rather, he claims that Mother has created "fear and anxiety in my children . . . about even playing baseball or playing sports

or doing things they've always loved to do." *Id.* In essence, Father testified he is opposed to the children relocating with Mother due to "the amount of time I actually get to see my kids or be part of their lives. Like I'll never coach them again. I won't get to see them every morning. . . ." *Id.* at 361. Father requested equally shared physical custody if Mother remains in Pennsylvania, and primary physical custody if she relocates to New Jersey. *See id.* at 378.

During their collective *in camera* interview, J.D., the middle child who was nine years old, provided nearly all of the answers to the trial court's inquiries as compared to eleven-year-old C.D. and six-year-old E.D. J.D. testified that Father has called Mother an "Italian B-*-*-*-H," and that "[h]e says stuff like she ruined the family. . . ." *Id.* at 13, 29. In addition, J.D. testified, "one time my dad . . . was so angry that he like picked me up and threw me on the bed. Like he threw me so hard."[3] *Id.* J.D. testified, "I just

---

[3] Father testified that this incident occurred during the parties' marriage, and it was the subject of one of Mother's reports to children and youth services after their separation. *See* N.T., 7/10/25, at 288. Father described the incident as follows:

> [C.D.] and [J.D.] were fighting downstairs in our living room, like brothers do. It got a little heated . . . so I separated the two. [C.D] went and sat down. [J.D.] kept trying to fight. So I picked [J.D] up underneath . . . my arm, brought him upstairs, brought him into his room. He's clinging onto me, trying to hit me, and I just chucked him down on his bed . . . lightly kind of toss[ed] him down on his bed. He hit the bed, he rolled over his knee, hit the wall, and there was an impression on the wall. There's no hole in the wall. . . .

*Id.* at 289.

feel like a little more safe with my mom." *Id.* at 19. J.D. spoke on behalf of his siblings by stating, "I think we're willing to go to New Jersey," and he expressed wishing to keep the partial physical custody schedule the same with Father. *Id.* at 26, 28. The court concluded that the children's testimony was of limited probative value because they "appeared to have been coached by" Mother. Trial Court Opinion, 7/31/25, at ¶ 16.

Finally, with respect to the custody evaluation, Mr. Masturzo submitted a thorough report based upon his individual interviews of the parties via video, text messages, telephone, and email. *See* Exhibit C-1 at 2. Mr. Masturzo also individually and privately interviewed the children by video on two occasions, first when they were present with Father in their paternal grandparents' home in Drexel Hill and then again when the children were present in the Waldwick house. *See id.* On both occasions, the children expressed their desire to maintain the current custody schedule between their parents and to relocate with Mother to New Jersey. *See id.* at 13-14, 15-17. The oldest child, C.D., told Mr. Masturzo that he worried whether Father "will not like him if he moves to New Jersey" with Mother. *Id.* at 13. Moreover, C.D. told Mr. Masturzo during his interview at the Waldwick house that, after Mr. Masturzo spoke to him and his siblings the prior week at his paternal grandparents' home, "Dad said mom cheated on him and we will break his heart if we move. Grandpop said look at the seventh commandment for

adultery. I can't believe you guys would turn your back on me. . . ." *Id.* (punctuation added).

Further, Mr. Masturzo participated in a "virtual tour" of the Waldwick house, and he virtually "observed" the marital residence and the home of Father's parents in Drexel Hill. *See id.* Mr. Masturzo found, in contrast to the Waldwick house, that the marital residence is in "fair/poor condition." Exhibit C-1 at 9. Specifically, he observed "[e]xposed electrical work and the condition of the front playroom, mudroom, and basement appear to be safety issues." *Id.*

Mr. Masturzo testified that "it's a good opportunity" for Mother to purchase the Waldwick house and emphasized that Mother consistently explained that the owner of the house is "a successful contractor [who] giv[es] back to his community through helping people." *Id.* at 117.

Ultimately, Mr. Masturzo recommended, *inter alia*, that the court continue the legal and physical custody awards exercised throughout the parties' separation with a schedule like that set forth in the interim order, and that the children be permitted to relocate to New Jersey. *See* Exhibit C-1 at 35. Mr. Masturzo's recommendation was based, in part, on his belief that the relocation will not "significantly impact" Father's relationship with the children. *Id.* at 34.

By order dated July 30, 2025, and entered on July 31, 2025, which was accompanied by a thorough opinion, the trial court awarded the parties shared

legal custody; Mother primary physical custody during the school year; and permitted the children to relocate with Mother to the Waldwick house in Bergen County, New Jersey. The order awarded Father partial physical custody every two out of three weekends per month from Friday after school until Sunday at 6:00 p.m. The order reversed the awards during the summer by placing primary physical custody in Father and partial physical custody in Mother with a schedule that was the same for that of the school year. The order also designated a holiday and vacation schedule. Finally, the order included additional provisions for the right of first refusal and for the parties to exercise flexibility with their custody time for the purpose of accommodating the other parent and/or allowing the children to attend birthday parties near the other parent's home.

On August 26, 2025, Father timely filed a notice of appeal. Father filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b) on September 9, 2025, wherein he asserted thirty-six errors by the court.[4] The trial court issued a Rule 1925(a) opinion on September 22, 2025,

_____

[4] By failing to concurrently file the concise statement with the notice of appeal, Father violated Pa.R.A.P. 1925(a)(2)(i). However, Mother does not claim that she was prejudiced as a result of Father's procedural misstep. In addition, Father's error did not impede the trial court's ability to issue a thorough opinion in response. Therefore, we conclude that his error was harmless, and we will not dismiss his appeal. *See In Re K.T.E.L*, 983 A.2d 745, 747 (Pa. Super. 2009) (holding that the failure to file a concise statement wherein it states errors complained of on appeal with the notice of appeal will result in a defective notice of appeal, to be disposed of on a case by case basis).

wherein it states that the errors asserted were "not concise and quite redundant."[5] Trial Court Opinion, 9/22/25, at 5, n.1. Nonetheless, the court responded to each of Father's assertions. *Id.* at 8-37.

Father has raised each of the thirty-six issues in his statement of questions involved in his brief. Our Supreme Court has declared that raising a staggering number of issues is not effective appellate advocacy and is "borderline abuse of the legal system." *Commonwealth v. Robinson*, 864 A.2d 460, 480 n.28 (Pa. 2004). The Court explained that "multiplying assignments of error will dilute and weaken a good case and will not save a bad one." *Id.* (emphasis omitted) (quoting Jackson, "Advocacy Before the United States Supreme Court," 25 Temple L. Q. 115, 119 (1951)).

Father presents the following issues in this appeal:

_____

[5] Rule 1925(b) provides "The Statement should not be redundant or provide lengthy explanations as to any error. Where non-redundant, non-frivolous issues are set forth in an appropriately concise manner, the number of errors raised will not alone be grounds for finding waiver." Pa.R.A.P. 1925(b)(4)(iv). However, this Court has previously stated that "[n]oncompliance with Rule 1925(b) may result in waiver." *Zabrosky v. Smithbower-Zabrosky*, 273 A.3d 1108, 1113 (Pa. Super. 2022) (citing *Commonwealth v. Reeves*, 907 A.2d 1 (Pa. Super. 2006) (observing that concise statement which is too vague or too verbose frustrates the ability of both the trial court and the appellate court to review the appeal)).

We disapprove of Father's lengthy concise statement of errors complained of on appeal. However, to the extent the trial court requests that this Court waive Father's issues on appeal for not being raised in accordance with Rule 1925(b), we conclude it is inappropriate in this case where the trial court provided a thorough review of Father's claims.

1.      Did the trial court commit an error of law and/or abuse of discretion by failing to adequately weigh the custody factors as set forth in 23 Pa.C.S. § 5328(a)(1) through (16)?

2.      Did the trial court commit an error of law and/or abuse of discretion in its application of the custody factors as set forth in 23 Pa.C.S. § 5328(a)(1) through (16)?

3.      With regard to custody factors was the trial court's decision against the weight of the evidence in contradiction to the bulk of credible evidence?

4.      With regard to custody factors was the evidence presented by Mother insufficient to support the trial court's decision confirming primary physical custody in Mother?

5.      Did the trial court commit an error of law and/or abuse of discretion in finding that 23 Pa.C.S. § 5328(a)(3) slightly favors [M]other due to the current custody arrangements?

6.      Did the trial court commit an error of law and/or abuse of discretion in finding that 23 Pa.C.S. § 5328(a)(4) favors [M]other due to the current custody arrangements?

7.      Did the trial court commit an error of law and/or abuse of discretion in finding that 23 Pa.C.S. § 5328(a)(10) slightly favors [M]other due to the current custody arrangements?

8.      Did the trial court commit an error of law and/or abuse of discretion in finding that 23 Pa.C.S. § 5328(a)(12) slightly favors [M]other due to the current custody arrangements?

9.      Did the trial court commit an error of law and/or abuse of discretion in giving Mother undue consideration and/or credit for the previous four factors as Mother manipulated and/or took unfair advantage of the judicial process in improperly obtaining primary physical custody of the minor children and then being able to retain primary physical custody of the minor children for approximately two (2) years as the parties awaited the conclusion of the custody trial?

10.     Did the trial court commit an error of law and/or abuse of discretion in finding that 23 Pa.C.S. § 5328(a)(14) slightly favors [M]other because Father waited ninety-seven (97) days before

undergoing a court ordered drug and alcohol test without any other credible evidence that Father abuses alcohol or drugs, or that Father has any kind of history of alcohol or drug abuse?

11. Did the trial court commit an error of law and/or abuse of discretion in awarding Mother primary physical custody after making a determination that Mother was not credible and that Father was credible?

12. Did the trial court commit an error of law and/or abuse of discretion in awarding Mother primary physical custody after making a determination that Mother had improperly coached the minor children?

13. Did the trial court commit an error of law and/or abuse of discretion in awarding Mother primary physical custody after making a determination that Mother has a history of thwarting Father's relationship with the Children?

14. Did the trial court commit an error of law and/or abuse of discretion in awarding Mother primary physical custody after making a determination that Mother alienated the minor children against Father and their community?

15. Did the trial court commit an error of law and/or abuse of discretion in awarding Mother primary physical custody after making a determination that Mother refuses to cooperate and co-parent with Father even when it is more convenient and in the best interest of the children to do so, while also making a determination that Father is more likely to encourage and permit contact between the children and Mother?

16. Did the trial court commit an error of law and/or abuse of discretion by failing to adequately weigh the relocation factors set forth in 23 Pa.C.S. § 5337(h)(1) through (h)(10)?

17. Did the trial court commit an error of law and/or abuse of discretion in its application of 23 Pa.C.S. § 5337(h)(1) through (h)(10)?

18. With regard to relocation factors was the trial court's decision against the weight of evidence in contradiction to the bulk of credible evidence?

19.     With regard to the relocation factors was the evidence presented by Mother insufficient to support the trial court's decision granting relocation for Mother?

20.     Did the trial court commit an error of law and/or abuse of discretion in finding that 23 Pa.C.S. § 5337(h)(2) and (h)(6) and (h)(7) favors Mother for the following reasons: (a) that one of the children has a learning disability; (b) the condition of the marital home versus the condition of the property located in New Jersey; (c) the fact that Mother is earning nine thousand dollars ($9,000.00) more in New Jersey and has the ability to become an administrator; (d) Mother has extended family in New Jersey; and (e) the quality of education offered in Bergen County?

21.     Did the trial court commit an error of law and/or abuse of discretion in awarding Mother relocation where Mother could not produce any credible evidence that one of the children has a learning disability or that New Jersey offers a better quality of education than Pennsylvania?

22.     Did the trial court commit an error of law and/or abuse of discretion in awarding Mother relocation where the trial court determined that Mother actually caused the condition of the marital home and then lied about the circumstances in obtaining her new residence in New Jersey?

23.     Did the trial court commit an error of law and/or abuse of discretion in awarding Mother relocation where Mother could not produce any credible evidence that her new employment provides a significant increase in salary, medical benefits, and/or job security?

24.     Did the trial court commit an error of law and/or abuse of discretion in awarding Mother relocation based on Mother's extended family living in New Jersey despite the fact that Mother has lived a majority of her life in Pennsylvania?

25.     Did the trial court commit an error of law and/or abuse of discretion in finding that 23 Pa.C.S. § 5337(h)(3) favors Mother where the only rationale is that Mother has a unique opportunity to purchase the proposed relocation residence even though the trial court found that Mother misrepresented and/or lied concerning the circumstances involving the opportunity to make this purchase?

26.    Did the trial court commit an error of law and/or abuse of discretion by failing to adequately weigh the relocation factors set forth in 23 Pa.C.S. § 5337(h)(4) where the trial court specifically found coaching and alienation?

27.    Did the trial court commit an error of law and/or abuse of discretion by failing to adequately weigh the relocation factors set forth in 23 Pa.C.S. § 5337(h)(6)?

28.    Did the trial court commit an error of law and/or abuse of discretion in awarding Mother relocation after making a determination that Mother was not credible and that Father was credible?

29.    Did the trial court commit an error of law and/or abuse of discretion in awarding Mother relocation after making a determination that Mother improperly coached the minor children?

30.    Did the trial court commit an error of law and/or abuse of discretion in awarding Mother relocation after making a determination that Mother has a history of thwarting Father's relationship with the children?

31.    Did the trial court commit an error of law and/or abuse of discretion in awarding Mother relocation after making a determination that Mother alienated the minor children against Father and their community?

32.    Did the trial court commit an error of law and/or abuse of discretion in awarding Mother relocation after making a determination that Mother refuses to cooperate and co-parent with Father even when it is more convenient and in the best interest of the children to do so, while also making a determination that Father is more likely to encourage and permit contact between the children and Mother?

33.    Given Mother's history and evidence in this case, did the trial court abuse its discretion and/or make an error of law in properly considering Mother's history of failing to act in good faith and attempting to limit Father's custodial time with the children?

34.    Did the trial court commit an error of law and/or abuse of discretion in awarding Mother primary physical custody against

the weight of evidence, the trial court's credibility determinations, and the trial court's determination of the custody factors?

35. Did the trial court commit an error of law and/or abuse of discretion in awarding Mother relocation against the weight of the evidence, the trial court's credibility determinations, and the trial court's determination of the relocation factors?

36. Did the trial court commit an error of law and/or abuse of discretion in awarding Mother primary physical custody and relocation in direct contradiction to the best interest of the minor children?

Father's Brief at 7–18.

We review Father's issues according to the following scope and standard of review:

> [T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. . . . However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. . . . Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

*R.M.G., Jr. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa. Super. 2009) (quoting *Bovard v. Baker*, 775 A.2d 835, 838 (Pa. Super. 2001)). Moreover,

> The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

- 17 -

> ***R.M.G., Jr., supra*** at 1237 (internal citations omitted). The test
> is whether the evidence of record supports the trial court's
> conclusions. ***Ketterer v. Seifert***, 902 A.2d 533, 539 (Pa. Super.
> 2006).

***A.V. v. S.T.***, 87 A.3d 818, 820 (Pa. Super. 2014).

We have explained, "It is not this Court's function to determine whether the trial court reached the 'right' decision; rather, we must consider whether, 'based on the evidence presented, [giving] due deference to the trial court's weight and credibility determinations,' the trial court erred or abused its discretion. . . ." ***King v. King***, 889 A.2d 630, 632 (Pa. Super. 2005) (quoting ***Hanson v. Hanson***, 878 A.2d 127, 129 (Pa. Super. 2005)). This Court has recognized that "the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record." ***Ketterer,*** 902 A.2d at 540 (quoting ***Jackson v. Beck***, 858 A.2d 1250, 1254 (Pa. Super. 2004)).

With respect to custody cases, the primary concern is the best interests of the child. "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual wellbeing." ***Saintz v. Rinker***, 902 A.2d 509, 512 (Pa. Super. 2006) (citation omitted).

Child custody actions are governed by the Child Custody Act ("Act"), 23 Pa.C.S.A. §§ 5321-5340. As the party proposing relocation, Mother had the burden of proving that relocation will serve the children's best interests as set forth under Section 5337(h), which provides as follows.

**(h) Relocation factors.--**In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S.A. § 5337(h).

The trial court in this case was also required to consider the custody factors set forth in the Act, as follows.

**§ 5328. Factors to consider when awarding custody.**

**(a)** *Factors.* – In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving substantial weighted consideration to the factors specified under paragraphs (1), (2), (2.1) and (2.2) which affect the safety of the child, including the following:

(1) Which party is more likely to ensure the safety of the child.

(2) The present and past abuse committed by a party or member of the party's household, which may include past or current protection from abuse or sexual violence protection orders where there has been a finding of abuse.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(2.2) Violent or assaultive behavior committed by a party.

(2.3) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party if contact is consistent with the safety needs of the child.

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life, except if changes are necessary to protect the safety of the child or a party.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's developmental stage, maturity and judgment.

(8) The attempts of a party to turn the child against the other party, except in cases of abuse where reasonable safety measures are necessary to protect the safety of the child. A party's reasonable concerns for the safety of the child and the party's reasonable efforts to protect the child shall not be considered attempts to turn the child against the other party. A child's deficient or negative relationship with a party shall not be presumed to be caused by the other party.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child or self from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a) (effective Aug. 13, 2024 to Aug. 28, 2025); ***see also***

***A.M.S. v. M.R.C.***, 70 A.3d 830, 836 (Pa. Super. 2013) (stating that, when

making a decision on relocation that also involves a custody decision, "the trial court must consider all ten relocation factors and all sixteen custody factors" outlined in the Act.).

This Court has explained that all of the factors listed in Section 5337(h) and Section 5328(a) are required to be considered by the trial court when entering a custody order. **A.V.**, 87 A.3d at 822 (citation omitted); **see also id**. at 823 (stating that Section 5323(d) applies to cases involving custody and relocation and "requires the trial court to set forth its mandatory assessment of the [. . .] factors prior to the deadline by which a litigant must file a notice of appeal.") (citations omitted).

Instantly, in its opinion accompanying the subject order, the trial court found that Section 5337(h)(2), (3), (4), (6), (7) and (8) favored Mother,[6] and (5) favored Father. The court found that (h)(1) and (9) favored neither party and (10) was inapplicable. **See** Trial Court Opinion, 7/31/25, at 45-50.

With respect to the custody factors, the court found that Section 5328(a)(3), (4), (10), (12), and (14) favored Mother,[7] and (2.3), (8), (11), and (13) favored Father.[8] The court found (a)(15) and (16) inapplicable, and

---

[6] With respect to Section 5337(h)(3), (4), (6), and (8), the court specifically found that they "slightly" favored Mother.

[7] Other than Section 5328(a)(4), the court found that these custody factors "slightly" favored Mother.

[8] The court found Section (a)(2.3) and (11) "slightly" favored Father.

that the remaining factors favored neither party. *Id.* at 37-45. We emphasize the court's conclusions particularly with respect to Section 5328(a)(4), the need for stability and continuity in the child's education, family life and community life, as follows.

> Mother testified that she currently spends most of her time in New Jersey, including when the children are in her custody. **Consequently, the children similarly spend most of their time in New Jersey and have established social relations there, such as their participation in summer camp.** However, . . . the children were born and raised in Pennsylvania where they have lived for most of their lives. As a result, they still possess considerable educational, family, and community connections in Pennsylvania. **Nevertheless, given the time elapsed since the establishment of the current custody arrangement [as set forth in the interim order], a significant modification would likely constitute a disruption to the children's stability and continuity**. . . .

Trial Court Opinion, 7/31/25, at 40 (cleaned up) (emphasis added).

> The court further reasoned, as follows.

> Even though this is a close call, the court finds that Mother has met her burden. The best interest factors impacting the safety of the children do not make a significant difference in this matter. . . . And because both parents clearly love the children very much, the factors involving providing a loving relationship are not particularly instructive. Instead, the court puts particular emphasis on its findings that the relocation will enhance the children's educational development and thereby their quality of life. *See* 23 Pa.C.S.A. § 5337(h)(2) & (7). The relocating school district is high quality and there are many opportunities for the children there. The concededly odd circumstances of the single family home available to Mother in the relocating area is unique and not transferable, and the court credits Mother's testimony and the inferences that she would not otherwise be able to afford real estate at the price point of the relocating home. It is a nice neighborhood in a nice community, and while it is a distance from Father [and his] extended family, it is close to Mother's extended family.

Further factors weigh in favor of granting the relocation. Because Mother is employed in the relocation area in a job that pays more than her previous job, it is fair to say that the relocation will enhance her quality of life from a financial opportunity standpoint and, by extension, the children. ***See*** 23 Pa.C.S.A. § 5337(h)(6) & (7). The court also credits her testimony that there are some unique educational or professional opportunities available in the relocation area that will provide her with unique professional and potential financial opportunities. Indeed, she has already acquired a better paying job in the relocating area . . . and is pursuing professional advancement.

The court recognizes that [since] the parties separated, Father [has] wanted shared physical custody of the children. . . . This court acknowledges that the relocation statute states that courts "shall hold an expedited hearing" on any proposed relocation. ***See*** 23 Pa.C.S.A. § 5337(g). This court further acknowledges that at some point, this matter was reassigned following section reassignments and that judicial resources are limited, and that both parties hoped for resolution of this matter as soon as possible.

But the reality is that since the parties' separation, for approximately the last eighteen months, Mother has had primary custody of the children. . . . The children did not express any upset or reservations about their daily life or the current arrangement. Although the court believes the children have been "coached" as well as improperly influenced by Mother . . . it does not mean that the children have completely lost their ability to express any preference at all. . . . The children are close with Mother and insisted they want to move to New Jersey. ***See*** 23 Pa.C.S.A. § 5328(a)(7); ***see id***. at § 5337(h)(4). Even despite the coaching, the court believes the children's preference is to relocate, even if their preferences are exaggerated due to improper coaching by Mother. The children are familiar with the area as Mother's extended family has lived there . . . [and] Mother would bring them . . . for visits. It therefore makes sense that they would have a positive impression of the relocating area.

The court also emphasizes its findings that it is feasible to preserve the relationship between the non-relocating party and the children through suitable custody arrangements. ***See*** 23 Pa.C.S.A. § 5337(h)(3). In so doing, the court does not minimize

that a relocating party is almost always, to some degree, adversely affected by the granting of a relocation. But the court notes that for approximately the past eighteen months, Father has had partial physical custody. . . . The alternating weekend custodial time can (at a minimum) be preserved as the proximity of the parties' residences is approximately a two-hour drive. *See* 23 Pa.C.S.A. § 5328(a)(11); *see id*. at § 5337(h)(3). Further, arrangements can be made to provide for Father having overall more partial physical custody (on an annual basis) than he currently has by increasing his weekend visitation during the school year and increasing his overall visitation during the summer months to primary physical custody. . . .

Because the children grew up here, the court acknowledges that a relocation necessitates some discontinuity in the children's education and community life. That said, because of the children's ties to the relocating community as well as the ability to maintain ties to the current area during time with Father, this factor is not controlling.

Trial Court Opinion, 7/31/25, at 51-54 (cleaned up; some citations omitted).

Turning to the merits of this appeal, the crux of Father's arguments with respect to the custody factors is that the court primarily based its decision on Section 5328(a)(3), the parental duties performed by each party, which it found in Mother's favor since she had exercised primary physical custody under the interim order for the eighteen months leading up to the conclusion of the trial. *See* Father's Brief at 30-37. By doing so, Father argues the court "disregard[ed] the historical reality that both parents have played equal roles in raising and caring for the children." Father's Brief at 22. In addition, Father argues the subject order is unreasonable in light of the court determining that Section 5328(a)(2.3), (8), and (13) weighed in his favor due to finding that

Mother "coached" the children and had engaged in alienating conduct in an effort to induce their preference for relocation. *See* Father's Brief at 38-41.

With respect to the relocation factors, Father argues that the court abused its discretion in weighing Section 5337(h)(2), (3), (4), (6), and (7) in Mother's favor. *See* Father's Brief at 46-64. Father's arguments amount to challenging the court's determinations regarding credibility and weight of the evidence. *See A.V.*, 87 A.3d at 820 ("[O]n issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses."). Concerning (h)(3), the feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, Father argues that, like the custody factors, the court's conclusion was unreasonable in light of its findings that Mother had engaged in alienating behavior. *See id.* at 64-70.

Upon review of the briefs of the parties, the relevant law, the certified record, and both opinions of the Honorable Rachel Ezzell Berry, we conclude that Father is not entitled to relief for the reasons expressed in Judge Berry's July 31, 2025 opinion that accompanied the subject order, and her September 22, 2025 Rule 1925(a) opinion. Therefore, we affirm on the basis of Judge Berry's able opinions and adopt them as our own. In any future filing with this or any other court addressing this ruling, the filing party shall attach a copy of Judge Berry's July 31, 2025 and September 22, 2025 opinions.

We conclude this decision with again stating that the primary concern in a custody case is the best interests of the children. As we have expressed before, a minimal degree of cooperation between parents is essential to proper parenting in cases where the mother and father no longer live together. This minimal degree of cooperation does not translate into a requirement that the parents have an amicable relationship. There is no question that the record in this case indicates that both Mother and Father love and properly care for their children. Equally clear is that Mother and Father regrettably do not have an amicable relationship. "Although such a positive relationship is preferable, a successful . . . custody arrangement requires only that the parents be able to isolate their personal conflicts from their roles as parents and that the children be spared whatever resentments and rancor the parents may harbor."[9]

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/6/2026

---

[9] This quote is from **B.C.S. v. J.A.S.**, 944 A.2d 600, 603 (Pa. Super. 2010), where former Justice James Fitzgerald commented upon the cooperation needed by parents in a custody case. Although the **B.C.S. v. J.A.S.** case concerned a shared custody arrangement, we find Justice Fitzgerald's astute observations to be applicable here.

IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA
CIVIL ACTION LAW

ANGELA M. DILWORTH,
Plaintiff

NO. CV-2023-006819

v.

IN CUSTODY

JOHN H. DILWORTH,
Defendant

Lucas Clark, Esquire, Attorney for Mother-Plaintiff Angela M. Dilworth
Peter Manaras, Esquire, Attorney for Father-Defendant John H. Dilworth

## FINDINGS OF FACT IN SUPPORT OF CUSTODY ORDER DATED 7/30/2025

Berry, J.                                                    Filed:

AND NOW, this July 30, 2025, following a two-day relocation and custody trial held on July 16, 2024 and July 21, 2025, the Court hereby makes the following findings of fact and conclusions of law in accordance with 23 Pa. C.S. § 5328:

1.      This action involves the parties' three children, C.D. (DOB 3/█2014), J.D. (DOB 9/█2015) and E.D. (DOB 1/█2019) (collectively, the "Children").

2.      On or around December 14, 2023, Plaintiff Angela Dilworth ("Mother") filed a Complaint for Custody (docket no. 9), which Defendant John H. Dilworth ("Father") answered on or around December 18, 2023 (docket nos. 12 & 13).

3.      When the parties resided together, and at the time of Mother's filing the Complaint for Custody, they resided in Delaware County, Pennsylvania.

4.      This matter has a highly litigious history and involves multiple petitions for special relief, contempt, and the like.

1

5.    On or around March 8, 2024, Mother filed a Notice of Proposed Relocation (docket no. 41), which Father opposes.

6.    This matter was originally assigned to the Honorable William C. Mackrides and, following section reassignments, was later assigned to the Honorable Rachel Ezzell Berry.

7.    Judge Mackrides ordered a custody evaluation as well as psychological evaluation of the parties.

8.    Although this trial was held before two different judges following section reassignments, Judge Berry gave the parties the opportunity to object to her handling and resolving the case, and neither party objected.

9.    The Court interviewed the Children in the robing room on the record.

10.    Although the Court usually interviews the Children at the end of proceedings because it was represented that the Children were highly stressed, the Court interviewed the Children first.

11.    The Children appeared tense and nervous at first, and the Court spend approximately an hour speaking with the Children.

12.    Two of the three children cried at different intervals while speaking in the back.

13.    The Children were competent to testify and understood the difference between telling the truth and telling a lie.

14.    The Children indicated that they liked to go to the pool and watch movies.

15.    Two Children testified that they were now disinterested in sports like baseball, but one Child in particular commanded a noteworthy knowledge of baseball history, recalling years (including ones before he was born) when the Philadelphia Phillies won or lost the World Series.

2

16. The Children appeared to have been coached by their Mother, which limited the probative value of their testimony.

17. One Child testified that Father had hurt Mother and left bruises on Mother's back and told the Court Mother had to stand rather than sit during a work meeting because of the bruises—information that seemingly the Child would only get from Mother.

18. Two of the Children described research they had done on the relative number of crimes committed in Delaware County, Pennsylvania as well as Bergen County, New Jersey, and described to the Court how crime data is represented on a map.

19. One Child testified that Father disparaged the schools in New Jersey as well as Mother's family.

20. One Child testified that the teachers in Pennsylvania are not as good as the ones in New Jersey.

21. One Child testified that Father stated Mother committed adultery or cheated and blew up the family.

22. One Child volunteered that Father uses nicotine products.

23. The Children stated that Father drinks beer, specifically IPAs (India Pale Ales, a type of craft beer).

24. Kevin Masturzo (the "Evaluator") testified.

25. Exhibit C-1 is the completed custody evaluation of Mother and Father.

26. The Evaluator conducted two video conference interviews with and two virtual home observations of Mother. *See* Ex. C-1 at 2.

27. The Evaluator reported that Mother had been dating someone for a couple of months. *See* Ex. C-1 at 5.

3

28.     The Evaluator reported Mother explained that Mother and Father were married from July 7, 2012, until August 10, 2023. *See* Ex. C-1 at 5.

29.     The Evaluator reported that Mother stated that Father displayed aggressive behavior throughout their relationship, including throwing and breaking a beer bottle and punching himself in the head at times. *See* Ex. C-1 at 5.

30.     The Evaluator reported that Mother recounted that she was concerned and scared that she would be 'locked-in' to her relationship with Father once and if they had a child together. *See* Ex. C-1 at 6.

31.     The Evaluator reported that Mother said that following the birth of her first child, she experienced postpartum depression and Father subsequently alienated her by denying her visits to her family or friends in New Jersey. *See* Ex. C-1 at 6.

32.     The Evaluator reported that Mother stated her marriage began to deteriorate following the birth of her second child. *See* Ex. C-1 at 6.

33.     The Evaluator reported that Mother recounted that Father would frequently drive under the influence and was emotionally abusive throughout the relationship. *See* Ex. C-1 at 6.

34.     The Evaluator reported that Mother recalled Father became physically abusive towards her in 2020. *See* Ex. C-1 at 6.

35.     The Evaluator reported that Mother stated Father would call Mother names such as an "Italian c--t," prevent her from leaving the home, throw things at her, and punched a hole into a wall adjacent to her head. *See* Ex. C-1 at 6.

36.     The Evaluator reported that Mother recounted how she experienced a miscarriage prior to the unplanned birth of their third child. *See* Ex. C-1 at 6.

4

37.     The Evaluator reported that Mother recounted her and Father's participation in couples' therapy for several sessions and that their counselor was aware that Father voiced suicidal ideations. *See* Ex. C-1 at 6.

38.     The Evaluator reported that Mother recalled attending four couples counseling sessions after she filed for divorce and that the sessions were largely unproductive. *See* Ex. C-1 at 6.

39.     The Evaluator reported that Mother stated the final straw was when Father allegedly threw one of the Children into a wall, resulting in a hole in the wall. *See* Ex. C-1 at 6.

40.     The Evaluator reported that he conducted two video conference interviews with and two virtual home observations of Father. *See* Ex. C-1 at 2.

41.     The Evaluator reported that Father stated that he and Mother married in 2012 and that their first child was "not exactly planned," but they were nevertheless both happy. *See* Ex. C-1 at 7.

42.     The Evaluator reported that Father felt that their marriage was 'all good' from 2015 to 2018. *See* Ex. C-1 at 7.

43.     The Evaluator reported that Father stated that the couple was in a "little bit of a funk" by the end of 2022. *See* Ex. C-1 at 7.

44.     The Evaluator reported that Father recounted that their first attempt at marital counseling was not successful since Mother was not vested in its outcome or participating in the counseling. *See* Ex. C-1 at 7.

45.     The Evaluator reported that Father stated that he would become frustrated and angry at the marital counseling sessions and that their marriage continued to deteriorate. *See* Ex. C-1 at 7.

5

46. The Evaluator reported that Father recounted Mother informed Father she was filing for divorce in August 2023. *See* Ex. C-1 at 7.

47. The Evaluator reported that Father recalled asking Mother in December 2023 whether their marriage was dead that she did not deny that she was in another relationship. *See* Ex. C-1 at 7.

48. The Evaluator reported that Father recalled that Mother told Father on or about December 27, 2023, that she was informing the Children of the divorce and threatened to call the police if he got upset. *See* Ex. C-1 at 7.

49. The Evaluator reported that Father said that the police served him on or about January 2, 2024, with a Protection from Abuse ("PFA") Order and that he agreed to give Mother exclusive possession of the marital home. *See* Ex. C-1 at 8.

50. The Evaluator reported that the marital home is in fair to poor condition and that the home does not appear to follow City/State regulations. *See* Ex. C-1 at 9.

51. The Evaluator reported that Mother's prospective four-bedroom, three-bathroom single family home in Waldwick, New Jersey, is in excellent condition. *See* Ex. C-1 at 10.

52. The Evaluator reported that Father resides with his parents in a three-bedroom, one-bathroom single family home in Drexel Hill, Pennsylvania, and that the home is in very good condition. *See* Ex. C-1 at 10.

53. The Evaluator reported Mother and the Children demonstrated typical interactions of a well-functioning family during both virtual home observations of Mother. *See* Ex. C-1 at 12.

54. The Evaluator spoke individually and privately with all three Children at the conclusion one of the virtual home observations at Mother's residence. *See* Ex. C-1 at 13.

6

55.     The Evaluator reported that child C.D. stated that he is excited about the possibility of moving to New Jersey but fears that Father will not like him if he does. *See* Ex. C-1 at 13.

56.     The Evaluator reported that C.D. specifically recounted the incident when Father allegedly carried one of the Children up the stairs and threw him onto a bed and his knee went through the wall. *See* Ex. C-1 at 13.

57.     The Evaluator reported that C.D. volunteered that Father told him and the other Children that Mother cheated on him, that their grandfather told them to look at the seventh commandment for adultery, and that Father was in disbelief that the Children would turn their backs on him. *See* Ex. C-1 at 13.

58.     The Evaluator reported that child J.D. recalled instances when Father hurt him multiple times in the past. *See* Ex. C-1 at 14.

59.     The Evaluator reported that J.D. stated that he wants to move to New Jersey and that he is not worried that Father will see the Children less. *See* Ex. C-1 at 14.

60.     The Evaluator reported that child E.D. stated that she enjoys spending time with Mother and Father, but that Father sometimes yells at her and her brothers. *See* Ex. C-1 at 14.

61.     The Evaluator reported that E.D. denied that Mother or Father is mean to her or hurts her. *See* Ex. C-1 at 14.

62.     The Evaluator reported that Father and Children demonstrated natural and positive interactions during both virtual home observations. *See* Ex. C-1 at 15.

63.     The Evaluator spoke individually and privately with all three Children at the conclusion of one of the virtual home observations at Father's residence. *See* Ex. C-1 at 15.

7

64.     The Evaluator reported that C.D. spoke of Father yelling and that Father will sometimes grab one of the other Children if they misbehave. *See* Ex. C-1 at 16.

65.     The Evaluator reported that C.D. stated that he thinks moving to New Jersey is a good idea and that the change will be good. *See* Ex. C-1 at 16.

66.     The Evaluator reported that J.D. stated that Father has hurt him many times, such as putting him in a choke hold "out of anger" when he misbehaved. *See* Ex. C-1 at 16.

67.     The Evaluator reported that J.D. stated he would like to move to New Jersey and that he likes the current custody arrangement. *See* Ex. C-1 at 17.

68.     The Evaluator reported that E.D. recalled she likes to have camp outs when they sleep downstairs. *See* Ex. C-1 at 17.

69.     The Evaluator reported that E.D. stated that Father will be mean and yell when she gets into trouble. *See* Ex. C-1 at 17.

70.     The Evaluator reported that E.D. said that she wants to move to New Jersey and likes Mother's house in New Jersey. *See* Ex. C-1 at 17.

71.     The Evaluator reported that Mother explained her reasoning to relocate to New Jersey is motivated by her desire to provide a better life for her children in terms of financial, educational, and emotional attainment. *See* Ex. C-1 at 17.

72.     The Evaluator reported that Mother has numerous concerns related to Father's history of emotional and physical abuse, lack of primary caregiving, and history of excessive drinking and driving under the influence. *See* Ex. C-1 at 18.

73.     The Evaluator reported that Mother petitioned for three PFA orders related to Father's alleged abuse which were withdrawn and/or dismissed. *See* Ex. C-1 at 18.

8

74. The Evaluator reported that Mother recounted the numerous reports to Children and Youth Services ("CYS") related to alleged abuse by Father which were all unfounded. *See* Ex. C-1 at 18.

75. The Evaluator reported that Mother stated she possessed numerous concerns related to the condition of the marital home. *See* Ex. C-1 at 18.

76. The Evaluator reported that Father is not in agreement with Mother's plan to relocate the Children to New Jersey. *See* Ex. C-1 at 19.

77. The Evaluator reported that Father denied Mother's accusations of physical and emotional abuse. *See* Ex. C-1 at 20.

78. The Evaluator reported that Father acknowledged that the multiple reports to CYS were determined to be unfounded. *See* Ex. C-1 at 20.

79. The Evaluator reported that Father stated he at times physically restrains one of the Children when they become physically aggressive and out of control. *See* Ex. C-1 at 20.

80. The Evaluator reported that Father feels Mother coached the Children. *See* Ex. C-1 at 20.

81. The Evaluator reported that Father stated that he believed the poor condition of the marital home was largely the result of Mother's modifications or her refusal to permit the necessary improvements. *See* Ex. C-1 at 20.

82. The Evaluator reported that Father believes Mother has prevented the Children from engaging in extracurricular activities or socialization in Pennsylvania so as to influence the outcome of custody proceedings. *See* Ex. C-1 at 20.

83. The Evaluator reported that Father believes the Children's participation in youth sports is a necessary way to provide stability and normally for the Children.

9

84. The Evaluator recommended that Mother and Father have shared legal custody of the Children while Mother maintains primary physical custody and Father receives partial physical custody. *See* Ex. C-1 at 35.

85. The Evaluator recommended that Mother be permitted to relocate the Children to New Jersey and have them attend the local schools. *See* Ex. C-1 at 35.

86. The Evaluator testified that he explained the process to the parents prior to conducting the evaluation.

87. The Evaluator testified that he told the parties to be honest and forthcoming, and that he will always go back to the other party to get a response.

88. The Evaluator indicated that he did not recall Mother telling him that Maternal Grandfather suffered from drug addiction.

89. The Evaluator indicated he did not recall Mother sharing that her parents were separated at some point in time.

90. The Evaluator indicated Mother conveyed that she does not use corporal punishment.

91. The Evaluator indicated that he considered corporal punishment to be acting physically, in the form of hitting or pinching a child.

92. The Evaluator testified that pushing a child against a wall might be considered corporal punishment.

93. The Evaluator agreed that the PFA Orders at least leading up until the report were all dismissed.

94. The Evaluator agreed that any CYS investigations at least leading up until the report were all found unfounded.

10

95. The Evaluator testified that the degree of severity could depend on whether an action is considered corporal punishment.

96. The Evaluator testified that he found it strange that a friend of hers wanted to "help others" and give back by selling her a home at below market value, at a near $600,000 discount.

97. The Evaluator indicated that he thought the real estate transaction was odd but that maybe this was a "good guy" with a mission.

98. The Evaluator testified that he questioned Mother about her statements and did not take her statements at face value.

99. The Evaluator testified that he did not recall if there were any arrests in connection with an alleged bar fight that involved Father.

100. The Evaluator testified that he did not have the time to go into every detail of the marriage, and that while he does a comprehensive interview, his focus is on child custody proceedings.

101. The Evaluator testified that marriages in which one party might stay in an abusive relationship and continue to have children, and that it is not odd or atypical.

102. The Evaluator testified that the history of the marriage is presented in the report but that the focus of his report is child custody.

103. The Evaluator testified that Father was not presenting as suicidal despite Mother's indication that he had experienced suicidal ideation in the past.

104. The Evaluator testified that the marital home was in fair to poor condition.

105. The Evaluator testified that he believed he knew Mother's boyfriend was a contractor and that he might be involved in making repairs.

11

106. The Evaluator testified that one of Mother's concerns about moving included the condition of the marital home.

107. The Evaluator indicated that he was aware that Mother filed three PFA petitions.

108. The Evaluator indicated that he was aware the Children were removed as protected parties at the *ex parte* hearing stage of the PFA process despite Mother's petitions for PFA requesting they be included.

109. The Evaluator indicated that he was aware all PFAs were eventually dismissed.

110. The Evaluator indicated he was aware that Mother had called the police multiple times.

111. The Evaluator indicated that it seemed Mother was not willing to change or modify the Order or be flexible.

112. The Evaluator considered that Mother had the opportunity to possibly become a principal if she were to relocate to New Jersey.

113. The Evaluator testified that Mother might not have the opportunity to buy an $800,000 house in Pennsylvania for below market value.

114. The Evaluator indicated that he understood Mother was able to get a better paying position in New Jersey.

115. The Evaluator indicated that he did not do research into the cost of living in New Jersey.

116. The Evaluator testified that he did not know what the job market or process was in Pennsylvania with respect to Mother becoming a principal in Pennsylvania.

12

117. The Evaluator confirmed that he spoke to Carol Ann Cilona, Mother's psychotherapist, and indicated he did not believe he investigated whether the psychotherapist had spoken with Father.

118. The Evaluator stated that Cilona did not make a custody determination and indicated that Cilona gave her opinions based solely on her sessions from Mother.

119. The Evaluator indicated Cilona's statements provided some support for Mother's statements as it was indicia that Mother was consistently telling another third party the same comments told to the Evaluator.

120. The Evaluator indicated he did not recall if Scott Cohen provided individual therapy sessions for Mother.

121. The Evaluator confirmed that Cohen and Veronica Richards had more interactions with Mother than with Father. *See* Ex. C-1 at 25.

122. The Evaluator stated that he did not have a professional relationship with Cohen or Richards.

123. The Evaluator testified that if the Children wanted to play on a sports team in Pennsylvania that they should be allowed to do so but recognized the distance between the two residences.

124. The Evaluator confirmed that the Children relayed instances of corporal punishment by Father which might rise to the level of being considered child abuse.

125. The Evaluator testified that the first PFA was withdrawn in exchange for exclusive possession, and that the second and third PFAs were granted initially but later dismissed.

13

126. The Evaluator testified that he was aware the township issued notices of violations on or around 2023.

127. The Evaluator testified that sometimes Children share a bedroom with their siblings or other adults and so it might not be surprising if the Children share a bedroom at Father's house.

128. The Evaluator indicated that Father and his brother have an on and off but overall good relationship at least according to Father.

129. The Evaluator confirmed he reviewed the psychological evaluations from Dr. Richard Roeder regarding both parents, and was aware Father's hair follicle test was taken close to one-hundred days after the court ordered it.

130. The Evaluator testified he did not believe that he was not aware of significant issues involving Mother violating the custody order.

131. The Evaluator testified that he is diligent about treating both parents the same and asking questions of each parent in the same order.

132. The Evaluator confirmed that he considered both the general custody best interest factors as well as the relocation best interest factors.

133. The Evaluator confirmed that he thought Father could benefit from pursuing personal therapy but was not aware of Father pursuing same.

134. The Evaluator testified that he investigates into the consistency of information provided by both of the parties.

135. The Evaluator indicated that one of his main takeaways was to continue the current child custody schedule of shared legal custody as well as the current schedule, and to extent Father's custodial time with the Children if there was a three-day weekend.

14

136.    The Evaluator noted the relocation would not severely interfere with the parties' abilities to spend time with the Children.

137.    The Evaluator stated it would not be a substantial impact on the Children but would provide them with an opportunity they did not otherwise have.

138.    The Evaluator indicated that Mother waiting three years to report an incident years ago is not necessarily uncommon and that it would not necessarily raise a red flag.

139.    The Evaluator indicated if the custody were 50-50 at this time, there is a possibility there would be a different outcome, but also a possibility that it would be the same.

140.    On July 16, 2024, Mother first appeared for this matter before the Honorable Judge Mackrides and gave her testimony; the transcript of which this Court reviewed in full.

141.    Mother testified that she made sure to have her psychological evaluation and substance abuse testing completed as a soon as possible.

142.    Mother testified that the psychological Evaluator opined in their evaluation of Mother that she is defensive and has anxiety.

143.    Mother testified that the ongoing legal proceedings and her marriage in general contributed to her defensiveness and anxiety.

144.    Mother testified that following his psychological evaluation, Father attended only a few anger management therapy sessions before he stopped.

145.    Mother testified that she has been receiving therapy and/or mental health treatment for a few years.

146.    Mother testified that she sought a custody arrangement that granted her primary custody of the Children while Father retains partial physical custody of the Children.

15

147. Mother testified that her desired custody arrangement would grant Father one week per month during the school year and alternating weeks during the summer.

148. Mother testified that her desired custody arrangement would also grant Father custody for spring Easter break and that she and Father would alternate custody for alternating holidays and school breaks.

149. Mother testified that under her desired custody arrangement she would be okay with Father receiving additional custody time if her relocation to New Jersey is approved.

150. Mother testified that she has no support system in Pennsylvania because all of her family and close friends are located in New Jersey.

151. Mother testified that the duration of the drive between the residence of Father and the proposed relocation residence would be approximately two hours .

152. Mother testified that the Children enjoy going to New Jersey and that it is her belief that the proposed relocation would improve the quality of life for the Children, including their financial, emotional, and educational wellbeing.

153. Mother testified that she has never withheld the Children from Father pursuant to the existing custody order.

154. Mother testified that her current employment in New Jersey enabled her to increase her yearly salary by approximately $9,000.

155. Mother testified that she was in a casual relationship with Michael Harkin ("Boyfriend") who resides in New Jersey.

156. Mother testified that her proposed relocation in New Jersey would result in a higher cost of living than her current residence in Pennsylvania.

16

157. Mother testified that she possesses the opportunity to purchase Boyfriend's home in New Jersey for $200,000 despite its fair market value of $740,000 because Boyfriend seeks to relocate closer to New York City.

158. Mother testified that Boyfriend is a magnanimous ex-United States Marine who assists his fellow Marines with a variety of issues including housing.

159. Mother testified that she has lived approximately seventeen to nineteen years in Delaware County and that she was formerly employed at Paramus Public Schools.

160. Mother testified that she has lived in Pennsylvania longer than she ever lived in New Jersey.

161. Mother testified that her sister lives in Havertown, Pennsylvania.

162. Mother testified that she refused Father's requests to spend more time with the Children because she feels that strictly adhering to the custody arrangement provides better structure and consistency for the Children.

163. Because of the amount of time that passed between the first and second day of the hearing, the Court permitted Mother to be called again.

164. Mother stated her current address is in Havertown, Pennsylvania.

165. Mother requested that she wants primary custody and that she can relocate to New Jersey to be closer to her extended family.

166. Mother testified that she makes $91,000 per year in her current job in Bergen County as a high school English teacher.

167. Mother testified that there are alternative houses except beyond the property for which she is subject to the lease agreement. *See* Ex. P-26.

17

168. Mother testified that she grew up in Bergen County, New Jersey and that all her family lives there.

169. Mother testified that she enrolled in a post-graduate principal program and is on track to graduate in May of 2026.

170. Mother indicated she believes principals and/or administrators in Bergen County, New Jersey receive high salaries.

171. Mother testified that housing, schooling, and employment have been secured in New Jersey.

172. Mother said over the past year, the co-parenting relationship between the parties have only gotten worse this past year.

173. Mother testified that she though moving to New Jersey would improve the co-parenting relationship because it will lessen the amount of physical and verbal conflict.

174. Mother testified that the drive is a little less than two hours without traffic and that she has made the drive on 181 days.

175. Mother testified that the parties do custody exchanges at a police station in Pennsylvania.

176. Mother testified that she is willing to be flexible on transportation.

177. Mother testified that she enjoys driving in the car with the Children and that they have playlists and routines that the Children enjoy.

178. Mother testified that her concerns about abuse, meaning physical abuse, have intensified.

179. Mother testified that she did not act in court following her Children's reports of abuse.

18

180. Mother testified that she did not contact CYS, rather other mandated reporters did.

181. Mother testified that the reports were unfounded, but that one report indicated that the family might qualify for services for reasons of Father's alleged substance abuse.

182. Mother testified that Father would show up at the school and discuss sports and the move to New Jersey in a way she described as "verbal abuse."

183. Mother testified that the oldest Child called her almost every day to discuss his concerns about Father.

184. Tracy Nini, the daughter's teacher, did not contact her.

185. Ex. P-32 is an email from one Child's teacher indicating the Child was upset about moving to New Jersey and did not want to go.

186. Mother testified that Father calls the Children losers on Facetime.

187. Mother testified that the Children are dysregulated after they return from Father's house.

188. Mother testified that she is in other rooms and hears when the kids are upset, and then interferes with the calls.

189. Mother testified that Father tells the Children she wears lingerie.

190. Mother testified that the Children use the words "fucknuts" and "foot fairy" to describe her family, this is exactly what the Children testified to.

191. Mother testified that Father signed the Children up for multiple baseball teams without consulting with Mother.

192. Mother testified that the Children only do sports with Father because he makes them.

19

193. Mother testified that one of the Children has a learning disability in the area of reading and qualifies for special education.

194. Mother testified that she resigned from Garnet Valley School District in August.

195. Ex. D-18 are documents from Garnet Valley School district stating "resigned 1/17/25."

196. Ex. D-18 indicates she had a return-to-work date of January 21, 2025.

197. Mother said the Children were begging to move to New Jersey.

198. Mother said the kids were devastated when she did not get emergency relocation.

199. Mother testified that "I don't say anything to my children about adult matters."

200. Mother testified that she only follows the custody order.

201. Mother testified that she has never provided Father with extra custody time.

202. Mother testified that it depends on who watches the kids when they get an early dismissal.

203. In January of 2024, Mother testified that Father drove by her house, and she called the police.

204. Mother testified that the Children take about their Father in therapy.

205. Mother testified that she cannot hear what the Children are doing in therapy, but that she often hears Father's Facetime calls with the Children.

206. Mother testifies that she has sit in sessions with the Children.

207. Mother testified that a school counselor or therapist recommended the Children write letters to Father.

208. Mother testified that one of the three children wanted to play football through Sacred Heart, the school where the children currently attend.

209. Mother testified that instead of playing flag football, the Children went to Cares.

210. Mother testified that her children enjoy sports.

211. Mother testified that she was casually dating the seller of the house.

212. Mother testified that she and the Children went to spend time at her friend's (previous boyfriend) mountain house for Memorial Day weekend.

213. Mother testified that after an alleged choking incident at a bowling alley, Mother called one of the Children's therapists.

214. Mother testified that she answered the Delaware County Intermediate Unit ("DCIU") questions regarding CYS.

215. Mother testified that the children have been dysregulated over the last year because they feel unsettled about an upcoming move.

216. Mother testified that she spends most of her time in New Jersey.

217. Mother testified that she volunteers at their summer camp, and that the Children play sports there.

218. Mother testified that she works as part of a barter deal, and that the kids attend summer camp for free because she volunteers at times.

219. Mother testified that the Children like playing sports and she would let them.

220. Mother testified that if the Children wanted to play baseball in New Jersey they would be allowed to do so.

221. Mother testified that over the last school year, she did not take them to any activities because they did not want to go.

222. Mother testified that she has agreed to Father's vacations, but that Father has not agreed to hers.

21

223. Mother testified that the Children get upset and their voices get loud while in therapy.

224. Mother wants drug and alcohol management as well as anger management for Father.

225. Adam Molineux testified as one of Father's witnesses.

226. Molineux testified that he lives in Haverford, Pennsylvania and has two children aged about the same age as the parties' Children.

227. Molineux testified that he has known the parties for eight years and that the parties have played baseball together, and that the Children are best friends.

228. Molineux testified that he and Father coached baseball together.

229. Molineux testified that Father is a loving and devoted parent who is always present and encouraging.

230. Molineux testified that Mother is a great parent just like Father.

231. Molineux testified that the parties' Children play less sports than they used to play.

232. Molineux testified that the Children are "baseball buddies."

233. Molineux testified that his son and the parties' son were to play against each other on game day when the children were assigned to different teams.

234. Molineux testified that Mother responded aggressively, and that the parties' Child did not end up playing in the game.

235. Molineux testified that there was a birthday party for his son, but that Mother did not make the Child available for the birthday party.

236. Molineux testified that the Children only play when Father has the kids.

22

237. Molineux testified that another of his children's birthdays he scheduled for a Wednesday because it was Father's custodial night, but that Mother made the children leave the party early consistent with the child custody schedule.

238. Molineux testified that there are one thousand children in the baseball league and that Father has minimal control of the travel schedule.

239. Molineux testified that there was an incident around Thanksgiving of last year at a bowling alley with the Children present.

240. Molineux testified that there were many adults present at the bowling alley that day.

241. Molineux testified that he was ten feet away when the following incident happened: groups of boys were playing with a chat function, there was an indication that one of the parties' Children was going to chat a swear word, and that Father appropriately pulled the Child back and did not strangle him at all.

242. Molineux testified that Father handled the situation appropriately and that the Child enjoyed the rest of the bowling activity after the incident.

243. Molineux testified that Father may raise his voice in a passionate manner when he is coaching but that he is never inappropriate.

244. John Dilworth ("Father") testified.

245. Father lives in Drexel Hill with his parents since January 2, 2024.

246. Father testified that he previously lived with Mother and the Children in Havertown for about eight years.

23

247. Father testified that there have been numerous contempt petitions, multiple contacts with the Haverford Police Department, multiple CYS investigations, and multiple PFA petitions.

248. Father testified that he never threw a Child through the wall, but that the two children were fighting so he broke them up, and when he tossed the Child on the bed his knee hit the wall leaving some sort of impression.

249. Father testified that the Child required no medical attention and neither the police nor CYS was contacted following the "knee incident."

250. Father testified that on another occasion, he was outside with the Children trimming hedges when one of the Children got a cut on the hand.

251. Father testified that the Child required no medical attention following the "cut incident."

252. Father testified that he agreed with Molineaux's assessment of the incident that happened at the bowling alley.

253. Father testified that he believes Mother interrogates the kids after his custodial time and asks the loaded questions.

254. Exhibit D-20 is a photograph of the children enjoying themselves at the bowling alley.

255. Exhibit D-21 are letters from CYS finding abuse "unfounded" and finding that protective services were not needed.

256. Father testified that his drug and alcohol test was negative.

24

257. Father testified that he got the test about ninety days later because he thought it was necessary to have it before the next review, and that Hearing Officer Martinez did not say when he had to get the test done.

258. Father testified that on all three PFA petitions Mother sought sole legal and physical custody.

259. Father testified that he does not have anger and aggression issues now.

260. Father testified that he and Mother planned to have Children together after they got married.

261. Father testified that an alleged incident in the kitchen involved Mother screaming curse words at him, that she put her hands on him first and he grabbed her hands yelling for her to stop.

262. Father admitted he called Mother an "Italian c-nt" and that it was wrong to do, he stated she hit him for saying it but insinuated it may have been partially deserved.

263. Father testified that he has never hit, kicked, or shoved Mother.

264. Father said prior to him leaving the house, there were no allegations of abuse.

265. Father testified that Mother took photographs of him sleeping or passed out near a beer can after he had worked a long day at his new contracting job.

266. Father testified that he has never been charged with any alcohol related offense.

267. Father testified that there have been occasions when he and Mother were drinking around the Children, but that Mother has never refused to get in the car with him.

268. Father testified that Mother has called the police something like seventeen times but that he has never been arrested or even had a firm talking to.

25

269. Father testified that he has never committed a PFA violation while subject to a temporary PFA.

270. Father testified that Mother was not physical with the Children when they lived together, but that she might be physical now.

271. Father testified that Mother does not allow the Children to transport toys between the residences.

272. Father testified that he used to read Hardy Boys books to the Children and that Mother gets rid of those books now.

273. Father testified that he does not think Mother is abusive or an alcoholic.

274. Father testified that his current contact with the Children is very limited, and that he never agreed to the temporary custody order wherein he gets Wednesday night visitation as well as every other weekend.

275. Father testified the custody arrangements have always been affected by PFAs before the temporary custody order went into effect.

276. Father testified that he thought the parties would have a 50-50 custody arrangement instead of what they currently have.

277. Father testified that when the children were home for a snow day on the Monday following his custodial weekend, Mother did not let Father have additional time with the Children when he asked.

278. Father testified that Mother did not let Father see the Children for Halloween or attend a trunk or treat event last year.

279. Father testified that Mother threatened to call the police if he went to their home to drop off school clothing.

26

280. Father testified that the Children regularly go to aftercare or hired babysitters, and sometimes with Maternal Grandmother.

281. Father testified that he tried to accommodate a baby shower event but that Mother accused him of stalking and that the Children missed their tournament games.

282. Father testified that Mother was at a wedding the weekend of the shower in Delaware County with her then-boyfriend, the same individual who has volunteered to sell a home to her for below market value.

283. Father stated that he believes alienation and manipulation have been occurring.

284. Father testified that Mother told the Children about the divorce during Christmas break 2023, and that he was removed from the house pursuant to a temporary PFA granted on or around January 2025.

285. Father testified that the Children never expressed wanting to move to New Jersey until Labor Day 2024, when Mother told the Children to tell Father what they wanted, and they said they wanted to move to New Jersey.

286. Father testified that his eight year old asked why Father was trying to deny him the chance at a better life?

287. Father testified that Mother has never had the Children in Havertown during her custodial time, not for a playdate or party or for any reason.

288. Father testified that Mother recently did not allow the Child to attend multiple birthday parties in Haverford during her custodial time.

289. Father testified that Mother has not attended any sports events in Delaware County for about a year.

290. Father testified that the Children have missed out on his family's birthday parties.

27

291.   Father has said Mother is good about following the custody order but other than that there is no compromise.

292.   Father testified that while the parties were together, they split parental duties like diapers and feeding.

293.   Father testified that he always coached the kids' sports, signed them up for piano lessons, and played with them.

294.   Father testified that he has taken the kids fishing and crabbing.

295.   Father testified that he cooks and bakes with the children.

296.   Father testified that he and Mother would take turns putting the Children to bed and reading to them.

297.   Father testified that the Children have always gone to Sacred Heart here in Delaware County, PA with few exceptions.

298.   Father testified that both parents wanted to give the children a Catholic education and that they made a mutual decision to send the Children to Sacred Heart.

299.   Father testified that they walk to and from school every day and that they have sports practice nearby.

300.   Father testified that they have a tight knit group of friends at Sacred Heart and through the community, mainly from sports.

301.   Father testified that he sees the Children at school not to be belligerent but because he misses and loves his Children.

302.   Father testified that Mother started having people drive the school two blocks to school so he could not meet the Children and walk with them part of the way to school.

28

303. Father testified that here in Delaware County, his parents, his brother, and his uncle's family, are all located nearby.

304. Father testified that the Children's godparents live nearby.

305. Father testified that things have gotten a lot better between him and his brother since Christmas 2024, even if they are not currently super close.

306. Father testified that Mother would occasionally go up to New Jersey to visit and that they would visit for holidays, but in the past, there was never a situation in which the Children begged to go.

307. Father testified that Mother has a support network here in Delaware County and that she lived here longer than the total amount of time she lived in New Jersey.

308. Father testified that the Children initially did not want the parties to get divorced.

309. Father testified that he believed Mother tried to turn the Children against Father because she limited his access to the Children and that she abused the civil system to get an advantage in custody proceedings.

310. Father testified that he believed Mother inspired the Children to have anxiety about things such as playing baseball.

311. Father testified that he never strangled his Child.

312. Father testified that he might have swatted the Child when he was very young but never got seriously physically aggressive.

313. Father testified that one Child now alleges he has strangled him in the past when that is not true.

314. Father testified that he feels he has missed out on eighteen months of the Children's lives and that it is time he will not get back.

29

315. Father testified that Mother loves the Children.

316. Father testifies that he has daily phone/video contact on the Our Family Wizard application for about ten to twelve minutes.

317. Father testifies that Mother interferes with his phone and video contact.

318. Father testified that he asked if the dog could come with the kids for custodial time and that Mother indicated that would have to be determined by the Court, which Father believes was intended to be spiteful.

319. The parties are currently about two miles apart and the proposed move is about 125 miles apart.

320. Father testified that he fears he will never coach them again if they move to New Jersey and will not see them in the mornings anymore.

321. Father testified that he believes Mother will abuse the civil system in the future if she moves.

322. Father testified that Mother's new boyfriend (which the parties dispute) stared at him on at least one occasion.

323. Father testified that he works for himself and that he can make his own schedule, and that Paternal Grandmother is available to assist.

324. Father testified that he tried to make compromises with Mother, but that Mother is never cooperative.

325. Father testified that he has a YouTube television account, and that Mother does not want to share the account.

326. Father stated there is no history of drug or alcohol abuse by him, Mother, or any member of his household.

30

327. Father testified that the parties were married for eleven years, and that Mother always had opportunities to get principal certification here in Delaware County.

328. Father testified that Mother is a great teacher and that in the past Mother did not pursue administrative opportunities in the past because she did not want to work twelve months out of the year.

329. Father testified that he was always supportive of Mother's career.

330. Father testified that at first, Mother was supportive of his choice to start his own business but that she later held it over his head.

331. Ex. D-23 includes information about Mother's proposed relocation, which is reportedly a higher cost of living.

332. Father stated he does not believe it makes financial sense for Mother to live in New Jersey.

333. Father testified that Mother's longtime friend/boyfriend he has never met before in his life, never sent a Christmas card, and never attended one of the Children's birthday parties.

334. Father testified that Mother is not a veteran.

335. Father testified that he was with Mother for thirteen years and never met Mother's longtime friend/boyfriend.

336. Father testified that the Children's church, community, friends, schooling, is all located in Delaware County, PA.

337. Father testified that at first, after deciding to divorce, the parties were able to do things together but at some point, around January 2024, that changed.

338. Father stated he wants relocation denied and that he wants 50-50 custody, and if she is permitted to relocate that he gets primary custody.

31

339. Father testified that the "cut" incident was reported to CYS.

340. Father admitted after the bowling incident CYS suggested a drug and alcohol evaluation, and he did an interview with a CYS caseworker.

341. Father testified that if the court ordered him to anger management, he would absolutely do it, but that he does not feel he has an anger problem.

342. Father testified that the children have been traumatized by all this.

343. Father testified that he understands both sides meet in the middle.

344. Father testified that Mother claims to be terrified of the kids when they are with Father and yet chooses to spend her time during his custodial time very far away as opposed to seven minutes away.

345. Father testified that he does not have a drinking problem.

346. Father testified that he does not drink every Lent.

347. Father testified that he cares more about his children than drinking.

348. Father testified that he drinks socially with the Children but never to excess with the Children.

349. Father testified that he has not lived alone with the Children, but that he lived with his parents.

350. Father testified that he agreed to let Mother have the martial home because he had parents nearby who he could live with, and she did not.

351. Father testified that the parties did not have a plan for custody and that this was part of the reason he did not move out of the house, because he thought the parties needed a plan.

352. Father testified that there was a period during which he had supervised custody.

32

353. Father testified that his father (paternal grandfather) had to be supervised at some point.

354. Father testified that he originally suggested four days on, four days off, as a 50-50 proposal would be consistent for them.

355. Father testified that Mother went to a wedding and learned that from theknot.com.

356. Father testified that the Children missed out on time with the friends and sports when Mother was not even with them despite it being her custodial time.

357. Father testified that Mother has a babysitter or neighbor taking the children to school in the morning instead of letting Father take the children to school.

358. Father testified that he does not berate the Children in the mornings to take them to school.

359. Father admitted that vacations need to be agreed on and that Mother has agreed to vacations.

360. Father testified that he only said no to Mother's vacation because it was during Christmas because he wanted to split the day of Christmas and she wanted to take the Children on vacation starting Christmas Eve.

361. Father testified that one of the Children put on his Christmas List for his parents not to break up.

362. Father testified that he told the Children that he did not want this and the Children did not want this.

363. Father testified that he asked the Children if any of the kids' friends whose parents were divorced, so that the kids would have other people to talk to.

33

364. Father admitted he makes comments that their friends or baseball teammates missed them on certain occasions.

365. Father said the kids have been playing baseball since they were four and two years old.

366. Father testified that he has never called the children losers.

367. Father testified that Mother interferes with the phone calls.

368. Father said Mother has attended almost no activities in Delaware County that involve the Children.

369. Father testified that he knows where Mother is because when the children call their mother they will ask about the dog or otherwise make it clear where Mother is.

370. Father testified that he is coaching at sports events and not in a position to stalk or harass her.

371. Father testified that Mother has recorded him at sporting events yelling, "50 feet John, 50 feet John."

372. Father testified that on the occasion of his sitting near Mother at a child's basketball game, there were only bleachers on one side of the gym and only three bleachers.

373. Father testified that he signed the Children up for baseball because the children always loved baseball and he wanted to maintain normalcy and consistency.

374. Father testified that during tournament season, sometimes there might be several baseball games on a given weekend day.

375. Father admitted that he has discussed the litigation with the Children.

376. Father testified that the Children would occasionally visit New Jersey but that Mother chose to go to school here, work here, and now she has changed her mind.

377. Father testified that he has not missed any of his scheduled weekends.

378. Father testified that there are three bedrooms, and that occasionally his parents sleep in separate bedrooms, during which time the Children have different sleeping arrangements.

379. Father testified that Mother stays with the children in a one-bedroom apartment in New Jersey.

380. Father testified that he enrolled the child in a public school just to get information for his IEP.

381. Father testified that if Sacred Heart could not accommodate the IEP, they might attend the public school district here.

382. Father testified that he would try to afford the marital home but that if he could not, he would try to buy a nearby property based on assets from equitable distribution, other savings he has, and help from family and friends.

383. Father testified that he believes experience a lot of anxiety and have been put in a tough position to pick between their mother and father.

384. Father testified that he has been involved in the children's therapy and that it was originally scheduled for Wednesdays.

385. Father testified that he believes the children need someone to talk to, and that he does not think therapy is dumb.

386. Father testified that the therapy has been controlled by Mother, that the therapists do not reach out to him, and he wonders why the therapist has told him things are going well when it seems the Children are upset.

387. Father testified that "Miss A" is someone he likes.

35

388. Exs. P-33 and P-34 are handwritten letters from the parties' oldest two children stating they want to relocate to New Jersey.

389. Father testified that he is quick to anger but also quick to calm down.

390. Father testified that he believed the Children were being coached, and that one example is how the Children told the Evaluator that Father yells, but Mother only raises her voice.

391. Father admitted that his feelings that he is being alienated from his children and that the civil system is working against him is frustrating.

392. The key to any custody trial is: What is in the best interests of the Children?

393. In 2010, the Pennsylvania General Assembly passed comprehensive custody legislation that specified factors a court must consider when determining what is best for a child, which has been recently updated following the enactment of "Kayden's Law."

394. This matter is therefore governed by 23 Pa. C.S. § 5329(a), the best interest factors which apply to disputes relating to child custody matters. *See E.D. v. M.P.*, 33 A.3d 73, 80 (Pa. Super. 2011).

395. This matter is also governed by 23 Pa. C.S. § 5337(h), which apply to disputes regarding to relocation matters.

396. The Court finds that it has jurisdiction over this matter as Father resides in Delaware County, Pennsylvania and this Court has previously made child custody determinations. *See* 23 Pa. C.S. § 5421–22.

397. Pennsylvania law provides that, in weighing the factors, "no party shall receive preference based upon gender in any award granted under this chapter." 23 Pa. C.S. § 5328(b).

398. "The Custody Act requires only that the trial court articulate the reasons for its

36

custody decision . . . . there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." *M.J.M. v. M.L.G.*, 63 A.3d 331, 336 (Pa. Super. 2013) (internal citations omitted).

399.    Under 23 Pa. C.S. § 5328, Factors to consider when awarding custody: "In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving substantial weighted consideration to those the factors specified under paragraphs (1), (2), (2.1) and (2.2) which affect the safety of the child...".

400.    "After considering the factors under section 5328(a)(2), if the court finds that there is an ongoing risk of harm to the child or an abused party and awards any form of custody to a party who committed the abuse or who has a household member who committed the abuse, the court shall include in the custody order safety conditions designed to protect the child or the abused party." 23 Pa. C.S. § 5323(e).

401.    The party proposing the relocation has the burden of establishing that the relocation will serve the best interest of the children as shown under the best interest factors. *Id.* § 5337(i).

## CUSTODY FACTOR ANALYSIS
## PURSUANT TO 23 Pa. C.S. § 5328(a)(1)–(16)

In ordering any form of custody, the Court shall determine the best interests of the child by considering all relevant factors, considering those factors which affect the safety of the child as set forth in 23 Pa. C.S. § 5328(a). *See C.M.K. v. K.E.M.*, 45 A.3d 417, 421 (Pa. Super. 2012). Father seeks partial physical custody in the form of every other weekend.

**1.      Which party is more likely to ensure the safety of the child. 23 Pa. C.S. § 5328(a)(1).**

37

Mother testified and the custody Evaluator reported that Mother's proposed New Jersey residence is in excellent condition. *See* Ex. C-1 at 9–10. Likewise, Father testified that he intends to try to afford the marital home and, if not, would seek to purchase a new home using proceeds from equitable distribution and financial assistance from friends and family. Moreover, Father testified, and the custody Evaluator reported that Father's current residence is in excellent condition. *See* Ex. C-1 at 10. In addition, both parties testified that the PFAs pursued against Father were withdrawn/dismissed and that the CYS investigations into Father's suspected abuse of the Children were determined to be unfounded.

This factor favors no party.

**2.     The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child which may include past or current protection from abuse or sexual violence protection orders where there has been a finding of abuse. 23 Pa. C.S. § 5328(a)(2).**

Both Mother and Father testified to the multiple filed PFA orders and CYS investigations which were all withdrawn/dismissed or declared unfounded, respectively.

This factor favors no party.

**2.1     The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services). 23 Pa. C.S. § 5328(a)(2.1).**

Mother and Father testified to the existence of multiple CYS investigations into suspected abuse committed by Father; however, all the investigations were determined to be unfounded. Additionally, the custody Evaluator acknowledged these investigations and their outcome in the custody evaluation. *See* Ex. C-1 at 23.

This factor favors no party.

38

a. **Violent or assaultive behavior committed by a party. 23 Pa. C.S.
§ 5328(a)(2.2).**

Both Mother and Father testified to the multiple PFAs against Father and CYS
investigations into Father's alleged abuse. Likewise, both parties testified that the PFAs were
withdrawn or dismissed and that the CYS investigations were determined to be unfounded.
While the Children did reference instances of alleged violent or assaultive behavior by Father,
their suspected coaching renders their testimony minimally probative.

This factor favors no party.

b. **Which party is more likely to encourage and permit frequent and continuing
contact between the child and another party if contact is consistent with the
safety needs of the child. 23 Pa. C.S. § 5328(a)(2.3).**

Mother testified that she strenuously adheres to the letter of the existing custody order
and does not grant Father any additional contact with the Children outside of the order.
Similarly, Father testified that Mother routinely and repeatedly refuses to grant Father any
additional time with the Children, even when doing so would be more convenient or efficient for
both parties. Likewise, Father testified that Mother generally prohibits the Children from
engaging in any socialization activities in Pennsylvania. Indeed, Mother testified that she spends
most of her time in New Jersey. Given Mother's history of obstinance and refusal to
compromise with requests by Father and Father's expressed desire for split equal custody, the
Court finds that Father is more likely to encourage and permit frequent and continuing contact
between the Children and Mother.

This factor slightly favors Father.

39

**3.     The parental duties performed by each party on behalf of the child. 23 Pa. C.S. § 5328(a)(3).**

Mother testified that she performs typical parental responsibilities when the Children are in her custody. To that end, Mother testified she has gone so far as to secure housing and education for the Children in New Jersey. Likewise, Father also testified that he performs typical parental responsibilities when the Children are in his custody, including supporting and coaching the Children's various youth sports endeavors. Indeed, Father testified that he believes Mother to be a "great mother." However, the terms of the current custody arrangement nevertheless mean that Mother performs more parental responsibilities than Father at this time.

This factor slightly favors Mother.

**4.     The need for stability and continuity in the child's education, family life and community life, except if changes are necessary to protect the safety of the child or a party. 23 Pa. C.S. § 5328(a)(4).**

Mother testified that she currently spends most of her time in New Jersey, including when the Children are in her custody. Consequently, the Children similarly spend most of their time in New Jersey and have established social relations there, such as their participation in summer camp. However, as both parties testified, the Children were born and raised in Pennsylvania where they have lived for most of their lives. As a result, they still possess considerable educational, family, and community connections in Pennsylvania. Nevertheless, given the time elapsed since the establishment of the current custody arrangement, a significant modification would likely constitute a disruption to the Children's stability and continuity in their education, family, and community life.

This factor favors Mother.

40

5.    **The availability of extended family. 23 Pa. C.S. § 5328(a)(5).**

Mother testified that she maintains close and continuing contact with her extended family who primarily reside in New Jersey. Father testified he maintains similar close and continuing contact with his extended family in Pennsylvania. In particular, Father testified that he presently lives with his parents, and that his brother, his uncle's family, and the Children's godparents live near the marital home in Pennsylvania.

This factor favors no party.

6.    **The child's sibling relationships. 23 Pa. C.S. § 5328(a)(2).**

Although the Children were nervous and stressed when speaking with the Court, they generally appeared to possess healthy and normal sibling relationships. Moreover, no party testified as to any issues between the Children, and the custody Evaluator did not report any significant relationship issues between the Children. *See* Ex. C-1 at 11.

This factor favors no party.

7.    **The well-reasoned preference of the child, based on the child's developmental stage, maturity and judgement. 23 Pa. C.S. § 5328(a)(7).**

The Children testified that they would rather live with Mother and expressed a desire to relocate to New Jersey. In doing so, however, the Children volunteered information to support their desire that reflected both coaching by Mother and concerning levels of involvement of the Children in this custody matter. In particular, two of the Children cited to their research of crime statistics for Delaware County, Pennsylvania and Bergen County, New Jersey, as evidence for their desire to relocate. Similarly, the Children uncharacteristically offered their negative views of the quality of teaching and education offered at their schools in Pennsylvania. In contrast, the Children spoke unusually and glowingly of the quality of education offered by their proposed

41

new school in New Jersey. Accordingly, the Children appeared to be coached, limiting the probative value of their testimony.

This factor favors no party.

**8.** **The attempts of a party to turn the child against the other party, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm. A party's reasonable concerns for the safety of the child and the party's reasonable efforts to protect the child shall not be considered attempts to turn the child against the other party. A child's deficient or negative relationship with a party shall not be presumed to be caused by the other party. 23 Pa. C.S. § 5328(a)(8).**

Father credibly testified that Mother has made attempts to turn the Children against him during this tumultuous separation. Even more, Father testified that children were consistently opposed to relocation to New Jersey until Labor Day 2024 when they called Father in the presence of Mother, exclaiming that they wanted to move. Additionally, when interviewed by the Court, the Children appeared coached with respect to inquiries about the proposed relocation and their apparent approval and to Father's alleged abuse. The Children unusually and freely volunteered instances of alleged abuse by Father in a atypical manner for the Children's ages and development. Moreover, the Children volunteered information regarding Father ostensibly outside the scope of their expected knowledge for their age; in particular, the Children recounted the particular types of alcohol consumed by Father, including the design of the cans and precise volumes drank, and that Father uses specifically Zyn brand nicotine pouches. Father credibly testified that he has never abused the Children and strongly denied that he abuses alcohol.

This factor favors Father.

**9.** **Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs. 23 Pa. C.S. § 5328(a)(9).**

Both parties can maintain a loving, stable, consistent, and nurturing relationship with the children. Mother testified she enrolled the Children in various recreational activities for the

42

summer, and that she takes them on trips to the New Jersey shore. Additionally, Father testified that he is the coach of the Children's youth sports teams. The Children testified that Father takes them to the pool over the summer in addition to their sporting events. With respect to their emotional needs, Mother testified that she assists the Children with therapy. Father testified that she began to cut two of the Children's hair at some point during the COVID-19 pandemic, and that he speaks with them about more emotional subjects during that time as well as others. Furthermore, the custody Evaluator reported that Mother, Father, and the Children demonstrated normal and well-functioning family interactions during their respective virtual home observations. *See* Ex. C-1 at 11–12; 14–15.

This factor favors no party.

**10.    Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child. 23 Pa. C.S. § 5328(a)(10).**

Both parties are capable of attending to the daily physical, emotional, developmental and educational needs of the children. Mother testified that she is currently taking care of the daily physical needs of the children. Additionally, Mother has enrolled the children in some form of therapy which she assists with. Father spends as much time with the children as he can but does not currently provide for the daily needs of the children.

This factor slight favors Mother.

**11.    The proximity of the residences of the parties. 23 Pa. C.S. § 5328(a)(11).**

Mother's relocation would be approximately 125 miles away from both Father's residence and the current community of the family. Mother's relocation is not a necessity and proposed on her own accord. Moreover, Mother has testified that she is comfortable with this drive and loves spending time with the Children in the car.

This factor slightly favors Father.

12. **Each party's availability to care for the child or ability to make appropriate child-care arrangements. 23 Pa. C.S. § 5328(a)(12).**

Both parties are available to care for the Children and make appropriate child-care arrangements. However, Mother currently spends more time taking care of the Children now due to the current custody arrangement.

This factor slightly favors Mother.

13. **The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child or self from abuse by another party is not evidence of unwillingness or inability to cooperate with that party. 23 Pa. C.S. § 5328(a)(13).**

Both parties testified to significant animosity between each other. Both parties testified that the current co-parenting efforts are unsuccessful. Father testified that Mother does not want to cooperate with any form of co-parenting. Father credibly testified to multiple instances where Mother denied reasonable requests from Father destroying any form of cooperation between the parties. Mother testifies that she does not deny these compromises instead she strictly adheres to the current custody arrangement.

This factor favors Father.

14. **The history of drug or alcohol abuse of a party or member of a party's household. 23 Pa. C.S. § 5328(a)(14).**

Mother testified that Father has a history with alcohol abuse. The custody Evaluator also testified that Father seemed defensive around the allegations of alcohol abuse. Additionally, all three Children testified as to some instances of this overuse. Father testified vehemently denying that he abuses alcohol. However, Father did testify that he waited 97 days before undergoing a court ordered drug and alcohol test which loses efficacy after 90 days from last consumption.

This factor slightly favors Mother.

44

**15. The mental and physical condition of a party or member of a party's household. 23 Pa. C.S. § 5328(a)(15).**

Both parties testified that the mental or physical conditions of the other party were not at risk in this case.

This factor favors no party.

**16. Any other relevant factor. 23 Pa. C.S. § 5328(a)(16).**

The Court does not find any other factor relevant.

This factor favors no party.

## RELOCATION FACTOR ANALYSIS
## PURSUANT TO 23 Pa. C.S. § 5337(h)(l)–(10)

**1. The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, sibling and other significant persons in the child's life.**

Both parties are the biological parents of the Children, and both testified that they have been caring for and involved in the Children's lives since birth. Further, prior to Mother and Father's divorce, both parties cohabitated and lived with the Children. Following the establishment of the current custody arrangement, both parties have maintained their respective parental responsibilities and relationships with the Children.

This factor favors no party.

**2. The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.**

The Children are relatively young, being ages eleven, nine, and six, respectively. *See* Ex. C-1 at 10–11. Mother testified that one of the Children has a learning disability and qualifies for special needs education. Mother testified that she has entered an agreement to purchase a four-

45

bedroom, three-bathroom home in Bergen County, New Jersey. In addition, the custody Evaluator reported that the proposed relocation residence is in excellent condition whereas the marital home is in poor to fair condition. *See* Ex. C-1 at 9–10. Moreover, Mother testified that her new employment in New Jersey raised her salary by approximately $9,000 and that school principals and/or administrators in Bergen County, New Jersey make more money than those in Pennsylvania. Mother also testified that most of her extended family resides in New Jersey. Furthermore, despite the apparent coaching of the Children by Mother, the Children do seem to possess some desire to relocate to New Jersey. Given the quality of the proposed relocation home and the quality of education offered by schools in Bergen County, New Jersey, the relocation would likely have a positive impact on the physical, educational, and emotional development of the Children.

This factor favors Mother.

3. **The feasibility of preserving the relationship between the non-relocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties**

Mother testified that the driving distance and time between the proposed relocation in Bergen County, New Jersey and Father's residence is 125 miles and approximately two hours without traffic. Additionally, Mother testified that she is willing to be flexible with transportation. However, Father credibly testified to a history of obstinate refusal by Mother to engage in co-parenting compromise with Father, even when doing so would likely be more efficient or in the best interests of the Children. This is further evidenced by the apparent coaching of the Children by Mother. Likewise, the proposed relocation distance would likely compromise Father's custodial time under the existing custody arrangement. Nevertheless, Mother testified that she has a unique opportunity to purchase the proposed relocation residence

46

at a significant discount in conjunction with the salary increase offered by her new employment in New Jersey. Similarly, although Father does not agree with relocation, he did not testify that he is financially or logistically incapable of maintaining his relationship with the Children if they relocate to New Jersey.

This factor slightly favors Mother.

**4. The child's preference, taking into consideration the age and maturity of the child.**

The Children testified to the Court that they desire to relocate to Bergen County, New Jersey. In addition, the Court found the Children competent to testify and that they understood the difference between the truth and a lie. However, the Children did appear coached by Mother, particularly with respect to their desire to relocate as expressed in a manner uncharacteristic for their respective ages and maturity. Nevertheless, the Children do seem to possess some desire to relocate to New Jersey despite the limited probative value of their testimony.

This factor slightly favors Mother.

**5. Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party**

Father testified that he believes Mother alienated the Children from him to induce their express desire for relocation. In particular, Father credibly testified to an unusual phone call on Labor Day 2024 to Father where Mother audibly directed the Children to tell Father that they suddenly desired to relocate. Likewise, Father credibly testified that he repeatedly tried to reach out to Mother and coordinate more time with the Children, but due to her strict adherence to the temporary custody order these attempts have provided little results. Notably, both parties offered conflicting testimony regarding the Children's level of interest in participating in youth sports, an activity in which Father's presence is considerable as coach of the Children's sports teams.

47

Likewise, Father's witness Molineux credibly testified to Mother's apparent hostility toward him when Molineux noted that one of his children and one of the Children would be on opposing sports teams. Molineux's testimony also tracks Father's testimony that Mother deliberately withholds the Children from socializing with their existing friends in Pennsylvania and participating in their youth sports (and thus spending time with Father). Accordingly, the Court finds that Mother has engaged in an established pattern of conduct to undermine the relationship of the Children and Father.

This factor favors Father.

6. **Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit and educational opportunity.**

Mother testified that her quality of life will be increased due to the relocation. Mother testified that she has a job with a possibility promotion to an administrator in New Jersey. Additionally, Mother provided evidence towards this increased standard of living offered by the relocation. *See* Ex. D-29. Mother also testified that her new employment in New Jersey increased by yearly salary by approximately $9,000 and that school principals and/or administrators in Bergen County, New Jersey stand to make more money than those in Pennsylvania. Moreover, Mother also testified to an unusual real estate opportunity provided by her apparently former Boyfriend to acquire her proposed relocation residence at an extreme discount. In addition, Mother testified that she lacks a support network in Pennsylvania, whereas most of her friends and family reside in New Jersey and in close proximity to the relocation area. Nevertheless, Mother did admit that her sister currently resides in Havertown, Pennsylvania, and that she has spent more of her life in Pennsylvania than in New Jersey. Even more, Mother also admitted that relocation to Bergen County, New Jersey would ultimately result in a higher cost of

48

living than remaining in Pennsylvania. Therefore, the Court finds that relocation would likely enhance the general quality of life for Mother.

This factors slightly favors Mother.

**7. Whether the relocation will enhance the general quality of life for the child, including but not limited to, financial or emotional benefit or educational opportunity.**

Mother testified that the relocation would enhance the quality of life for the Children as well as the educational and emotional benefit. Mother testified that Bergen County, New Jersey has better schools and quality of education, a fact that the Children were notably privy to as reflected in their testimony to the Court. Mother also testified that she has enrolled the kids in therapy and is looking to promote their emotional well-being with the relocation so as to minimize further acrimony between herself and Father. In addition, Mother's recent and continued presence in New Jersey while the Children are in here custody has resulted in the Children developing some degree of connection and familiarization with the proposed relocation area. Likewise, Mother's unusual real estate opportunity would grant the Children an increased quality of life given the property's size and excellent condition. *See* Ex. C-1 at 9–10. Accordingly, the Court finds that relocation would enhance the general quality of life for the Children.

This factor favors Mother.

**8. The reasons and motivation of each party for seeking or opposing the relocation.**

Mother testified that the relocation is both for the betterment of the children education as well as an increase to her financial ability. Additionally, Mother testified that her extended family and friends primarily reside in New Jersey. Father testified that he opposes relocation to maintain a sense of stability and consistency in the lives of the children. In particular, Father

49

testified that he opposes relocation as it would compromise his relationship with the Children and continue to have a relationship with them such as coaching their sports teams.

This factor slightly favors Father.

**9.    The present and past abuse committed by a party of member of the party's household and whether there is a continued risk of harm to the child or an abused party.**

Both parties testified to multiple filed PFAs and CYS investigations filed against Father by Mother which were all dismissed or resulted in an "unfounded" status, respectively.

This factor favors no party.

**10. Any other factor affecting the best interest of the child.**

The Court does not find any other factor relevant to a relocation analysis.

This factor favors no party.

## DISCUSSION

The Court's analysis demands more than merely counting the factors and deciding which party scored more points. A custody analysis "is not a scorecard" and select factors may serve as the motivating force behind a Court's decision. *See White v. Malecki*, 296 A.3d 1210, 1214 (Pa. Super. 2023). The Court is guided by consideration of all the above factors and then, after scrutinizing those items, determining from the broad canvas what design will serve the best interests of the Child, all while paying special consideration to the factors that impact the safety of the Child. *See C.M.K. v. K.E.M.*, 45 A.3d 417, 421 (Pa. Super. 2012) (discussing the importance of the safety-related factors in the context of

50

relocation). Because Mother is the party proposing relocation, she bears the burden of proving that relocation would serve the Children's best interests as well as the integrity of her motives in seeking relocation. *See* 23 Pa. C.S. § 5337(i).

Even though this is a close call, the Court finds that Mother has met her burden and will permit the relocation. *See id.* The best interest factors impacting the safety of the Children do not make a significant difference in this matter. *See id.* §§ 5328(a), 5337(h). To the extent Mother claims otherwise, the Court finds her not credible; indeed, her proposed final custody order suggests Father should get more physical custody than he currently has. And because both parents clearly love the Children very much, the factors involving providing a loving relationship are not particularly instructive. Instead, the Court puts particular emphasis on its findings that the relocation will enhance the Children's educational development and thereby their quality of life. *See id.* § 5337(h)(2) & (7). The relocating school district is high quality and there are many opportunities for the Children there. *See id.* The concededly odd circumstances of the single-family home available to Mother in the relocating area is unique and not transferable, and the Court credits Mother's testimony and the inferences that she would not otherwise be able to afford real estate at the price point of the relocating home. *See id.* It is a nice neighborhood in a nice community, and while it is a distance from Father's extended family and childhood friends, it is close to Mother's extended family.

Further factors weigh in favor of granting the relocation. Because Mother is employed in the relocation area in a job that pays more than her previous job, it is fair to say that the relocation will enhance her quality of life from a financial opportunity standpoint and, by extension, the Children. *See id.* § 5337(h)(6) & (7). The Court also credits her testimony that

51

there are some unique educational or professional opportunities available in the relocation area that will provide her with unique professional and potential financial opportunities. *See id.* Indeed, she has already acquired a better paying job in the relocating area (and, to her credit, followed the existing order and not used the long commute as an excuse for limiting Father's time or insisting transportation be shared), and is pursuing professional advancement. *See id.*

The Court recognizes that when the parties separated on or around January 2024, Father wanted shared physical custody of the Children despite the entry of the Temporary PFA Orders and, eventually, the Temporary Custody Order granting Mother primary physical custody. This Court acknowledges that the Relocation Statute states that courts "shall hold an expedited full hearing" on any proposed relocation. *See id.* § 5337(g). This Court further acknowledges that at some point, this matter was reassigned following section reassignments and that judicial resources are limited, and that both parties hoped for a resolution of this matter as soon as possible.

But the reality is that since the parties' separation, for approximately the last eighteen months, Mother has had primary custody of the Children. Because Mother has been the Children's primary caretaker for the past eighteen months, it is fair to say that she is more involved in the Children's day-to-day life and completes more parental duties. *See id.* §§ 5328(3) & (4), 5337(h)(1). She attends to the daily needs of the Children and is likely to attend to the Children's daily emotional and developmental needs. *See id.* § 5328(10). The Children did not express any upset or reservations about their daily life or their current arrangement. Although the Court believes the Children have been "coached" as well as improperly influenced by Mother (more on that to follow), it does not mean that the Children have completely lost their ability to express any preference at all—their preference is just

52

perhaps not as probative or controlling as it would have been had the Court found they had not been improperly coached. The Children are close with their Mother and insist they want to move to New Jersey. *See id.* §§ 5328(7), 5337(h)(4). Even despite the coaching, the Court believes the Children's preference is to relocate, even if it their preferences are exaggerated due to improper coaching by Mother. *See id.* The Children are familiar with the area as Mother's extended family has lived there for some time, including before the parties separated, when Mother would bring them to the area for visits. *See id.* It therefore makes sense that they would have a positive impression of the relocating area. *See id.*

The Court also emphasizes its finding that it is feasible to preserve the relationship between the nonrelocating party and the Children through suitable custody arrangements. *See id.* § 5337(h)(3). In so doing, the Court does not minimize that a nonrelocating party is almost always, to some degree, adversely affected by the granting of a relocation. *See Carrero v. Lopez*, 300 A.3d 494, 505 (Pa. Super. 2023) ("That the parties might incur additional costs and hardship to facilitate custody exchanges is true in virtually every relocation case."). But the Court notes that for approximately the past eighteen months, Father has had partial physical custody in the form of every-other-weekend visits as well as one dinner per week (not an overnight). The alternating weekend custodial time can (at a minimum) be preserved as the proximity of the parties' residences is approximately a two-hour drive. *See* 23 Pa. C.S. §§ 5328(a)(11), 5337(h)(3). Further, arrangements can be made in to provide for Father having overall more partial physical custody (on an annual basis) than he currently has by increasing his weekend visitation during the school year and increasing his overall visitation during the summer months to primary physical custody. *See id.* By doing this, Mother will still be the Children's

53

primary custodian, but Father will have more time with the Children during the summer months to compensate for the hardship he will face during the school year. *See id.*

In reaching this determination, it bears mentioning which best interest factors favored Father. Because the Children grew up here, the Court acknowledges that a relocation necessitates some discontinuity in the Children's education and community life. *See id.* § 5328(a)(4). That said, because of the Children's ties to the relocating community as well as the ability to maintain ties to the current area during time with Father, this factor is not controlling. *See id.*

That said, even if the proposed relocation would improve the Children's quality of life and provide for more opportunities, the Court finds that Mother has made efforts to undermine the Children's relationship with their Father. *See id.* §§ 5328(a)(2.3) & (8); 5337(h)(5). She is therefore not the party more likely to encourage frequent and continuing contact with the other party, rather, she has made efforts to turn the Children against their Father by alienating them from their Father. *See id.* §§ 5328(a)(2.3) & (8); 5337(h)(5). Not all the Children's anxiety in being interviewed by the Court can be attributed to Mother's actions, as the experience can be stressful in general, and children manifest that stress in different ways. But the degree to which the Children were aware of the contentious litigation between the parties—for instance, volunteering to the Court a comparison of crime statistics in the relocating and nonrelocating counties as an explanation for why they wanted to relocate—was totally unnecessary, obvious evidence of coaching, and not in their best interest.

Further, Mother's repeated and steadfast refusal to ever deviate from the Temporary Custody Order, even to allow the Children to enjoy the last few minutes of a friend's birthday

54

party, was particularly noteworthy in it showed just how unwilling she has been to cooperate with Father. *See* § 5328(a)(13). Mother seems to confuse blind adherence to a custody order with being a willing and flexible co-parent. There were times when Father would ask if he could pick the Children up earlier than the scheduled time and she declined, even when it seemed the Children were with a babysitter or other non-relative. While that is not necessarily an inappropriate childcare arrangement, it sure is not evidence of promoting frequent and continuing contact between the Children and the other parent. *See* § 5328(a)(2.3). Accordingly, the Court is going to enter a right of first refusal in its final custody order.

Although the Court acknowledges that Father has used abhorrent language towards Mother in the past, and that his behavior contributed to the conflict between the parties, it wonders: In what way has Mother cooperated with Father aside from failing to violate the Temporary Custody Order? Yes, she approved his vacation, but failing to do so without a compelling reason might have constituted a violation of the Temporary Custody Order. And no, Father objecting to Mother's proposed vacation—in which Father would have completely missed the first Christmas with his Children, on the first Christmas since the parties' separation—is not indicative of a failure to cooperate as a co-parent. How would Mother have felt if Father took the Children on vacation for that holiday, and she missed Christmas Eve bedtime, Christmas morning, and Christmas dinner with her young children? Probably pretty terrible. At least Judge Mackrides was able to intervene in that instance, unlike around Halloween, when Mother was unwilling to accommodate any trick-or-treating or trunk-or-treating time for Father, and he completely missed out. As every parent knows, children grow up quickly, and one cannot get time back.

55

The Court opines on this to emphasize that courts in general can only do so much in a custody order. We cannot foresee every potential problem and solve for it in advance. We can only try to resolve as much as possible, as quickly as we can, within the confines of the law, and hopefully set the stage for less conflict in the future. Of course, following the custody order is the status quo, not every accommodation is feasible, and nonstop modifications are disruptive. But that does not mean that occasional compromise is a bad thing. Compromise is, in fact, a hallmark of successful co-parenting. And one straightforward way of determining whether one is acting as a cooperative co-parent is by asking oneself, how would I want to be treated if I was in the other parent's position?

An Order designed to accommodate the best interests of the Child is being entered contemporaneously and consistent with the above findings, conclusions, and discussion.

**BY THE COURT:**

_____

**RACHEL EZZELL BERRY, J.**

**Notice:** No Party may make a change in the residence of any child which significantly impairs the ability of the other party to exercise custodial rights without first complying with all the applicable provisions of 23 Pa. C.S. § 5337(c) and Pa. R.C.P. 1915.17 regarding relocation.

56

IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA
CIVIL ACTION LAW

A.D.,
Plaintiff

v.

J.D.,
Defendant

TRIAL CT. NO. CV-2023-006819

IN CUSTODY

FILED OJS DELAWARE C
2025 SEP 23 12:4

APP. CT. NO. 2242 EDA 2025

Lucas Clark, Esquire, Attorney for Mother-Plaintiff A.D.
Peter Manaras, Esquire, Attorney for Father-Defendant J.D.

### OPINION

Berry, J.

Filed: 9/22/25

J.D. ("Father") appeals this trial court's Final Custody Order dated July 30, 2025, on which date the trial court also issued Findings of Fact and Conclusions of Law. This trial court entered a Final Custody Order granting A.D.'s ("Mother") request to relocate from Delaware County, Pennsylvania to Bergen County, New Jersey. The trial court further granted the parties shared legal custody, Mother primary physical custody, and Father partial physical custody of the parties' children during the school year, and Father primary physical custody and Mother partial physical custody of the parties' children during the summer break. Because Father does not demonstrate an abuse of discretion or legal error, his appeal is without merit, and the trial court's Final Custody Order should be affirmed.

### I.  FACTUAL AND PROCEDURAL HISTORY

The parties were married on or around July 7, 2012. They have three children together: C.D. (born March 2014), J.D. (born September 2015), and E.D. (born January 2019)

**R.R.  1**

(collectively, the "Children"). From marriage until separation, the parties and the Children resided in Delaware County, Pennsylvania. Mother used to work in Delaware County, Pennsylvania but more recently started working in New Jersey. At all times, most of Mother's extended family, including her parents lived in New Jersey. Mother credibly testified that throughout the Children's lives she regularly brought them to New Jersey to visit her relatives and to celebrate holidays.

Because Mother's actions influenced its ultimate decision, and because it relates to Father's issues on appeal, the trial court provides some additional procedural information regarding the parties' divorce and history of Protection from Abuse ("PFA") actions. This matter was originally assigned to the Honorable William C. Mackrides on or around August 10, 2023, when Mother filed for divorce (docket no. 1). On or around September 11, 2023, Father filed an Answer (docket no. 3). On or around November 9, 2023, the parties entered into a stipulation regarding matters relating to the divorce (docket no. 8).

On or around December 14, 2023, Mother filed a Custody Complaint as well as a Petition for Special Relief for Exclusive Possession of the marital residence (docket nos. 9 & 10). On or around December 18, 2023, Father filed Answers to both petitions (docket nos. 12 & 13). Judge Mackrides scheduled a hearing on the Motion for Special Relief for Exclusive Possession for January 19, 2024. But on January 2, 2024, Mother filed a Petition for PFA against Father, which the trial court granted after an ex parte hearing. The Temporary PFA Order listed just Mother as a protected party, excluded Father from the marital residence, and granted Mother temporary physical custody of the Children (case no. CV-2024-080010, docket no. 6) (Krull, J.). The Temporary PFA Order was later dismissed upon Mother's motion to withdraw or discontinue the action (case no. CV-2024-080010, docket no. 10) (Lowe, J.). On or around January 19, 2024,

R.R. 2

2

the parties entered into a stipulation regarding Mother's Petition for Special Relief, permitting Mother to remain at the marital residence (docket no. 18). Also on or around January 19, 2024, following an appearance before a hearing officer, the trial court issued a Temporary Custody Order granting Mother primary physical custody, Father partial physical custody, and joint legal custody of the Children (docket no. 36).

On January 30, 2024, Mother filed another Petition for PFA against Father, which the trial court granted after an ex parte hearing. The Temporary PFA Order also listed just Mother as a protected party, but made no changes to the current custody order (case no. CV-2024-080182, docket no. 3) (Berry, J.). After several continuances, on April 4, 2024, following a hearing, the trial court dismissed Mother's Petition for PFA (case no. CV-2024-080182, docket no. 12) (Lowe, J.).

Starting around this time, many petitions were filed, mostly by Mother. These petitions mostly requested special relief or for findings of contempt against Father. More importantly for purposes of this appeal, on or around March 8, 2024, Mother filed a Notice of Proposed Relocation (docket no. 41), for which on or around March 14, 2024 Father filed a Counter-Affidavit (docket no. 44). On or around March 26, 2024, Mother filed a Petition for Custody Relocation (docket no. 48), to which Father filed an Answer on or around April 4, 2024 (docket no. 50). Meanwhile, the parties' filings continued.

On July 16, 2024, Judge Mackrides held the first day of trial, but the matter was not tried to completion. On July 29, 2024, Mother filed a third Petition for PFA against Father, which the trial court, after an ex parte hearing, granted. This Temporary PFA Order listed both Mother and the three Children as protected parties, and entered a temporary custody order providing for only phone and video calls between Father and the Children pending the next court hearing (case no.

CV-2024-081322, docket no. 4) (Berry, J.). On August 8, 2024, the trial court dismissed Mother's Petition following a hearing on the matter (case no. CV-2024-081322, docket no. 9) (Berry, J.).

On August 16, 2024, Mother filed an Emergency Custody Motion/Petition to Allow for Relocation, which Judge Mackrides denied. Still, the filings continued. It appears the matter was then continued multiple times. At some point, Judge Mackrides ordered a custody evaluation. The custody evaluator recommended that the court approve the relocation and grant primary physical custody to Mother. (*See* Ex. C-1.)

In May 2025, following judicial reassignment, this matter was assigned to Judge Berry. On June 6, 2024, Mother filed another Petition for Contempt, which on June 13, 2025 this trial court denied (docket no. 149). On June 30, 2025, Mother filed a Motion in Limine, which on July 8, 2025 this trial court granted, indicating that the Children would participate in the custody trial proceedings (docket no. 152). This trial court then tried the matter to completion on July 21, 2025, at which time the parties were invited to object to the handling or resolution of the matter because two different jurists heard it. Neither party objected. On July 30, 2025, this trial court entered its Final Custody Order as well as Findings of Fact and Conclusions of Law (docket nos. 154 & 155). This trial court proceeded to grant Mother's request for relocation, award primary physical custody to Mother and partial physical custody to Father (while providing for different custodial periods depending on whether school was in session) as well as shared legal custody to both parties.

On or around August 5, 2025, Father filed a motion for reconsideration, which this trial court heard and denied on August 25, 2025 (docket no. 168). Father's timely appeal followed.

On or around September 9, 2025, Father filed his Concise Statement, which included *thirty-six* issues[1] stylized in the form of questions.[2]

## II.    DISCUSSION

Child custody actions are governed by the Child Custody Act, 23 Pa. C.S. §§ 5321–40. Section 5328(a) sets forth the factors that a trial court must consider when awarding custody.[3] Section 5337(h) sets forth the ten factors that a trial court must also consider when a parent seeks to relocate with a child. The party requesting the relocation, here Mother, has the burden of establishing that the relocation will serve the best interest of the children. *See id.* § 5337(i). Mother and Father each have the burden of establishing the integrity of their motives in either seeking the relocation or seeking to prevent the relocation. *See id.* "[T]he paramount concern of the trial court is the best interest of the child." *A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014).

This trial court incorporates the reasoning set forth in its July 30, 2025 Findings of Fact and Conclusions of Law as responsive to the issues of whether it abused its discretion, misapplied the law, acted unreasonably, or committed reversible error in its analysis or

---

[1] This trial court observes that Rule 1925 requires that the "Statement should not be redundant or provide lengthy explanations as to any error. Where non-redundant, non-frivolous issues are set forth in an appropriately concise manner, the number of errors raised will not alone be grounds for finding waiver." *See* Pa. R.A.P. 1925(b)(4). For unknown reasons, the Order this trial court signed on August 27, 2025 is not yet reflected on the docket (even though this is likely a fast-track appeal requiring the statement to be included contemporaneously with the notice of appeal). In any event, this trial court respectfully contends that the Statement is not concise and quite redundant, which arguably serves as a basis to quash Father's appeal in its entirety. *See id.*

[2] The trial court notes that posing the "concise statements" as questions is confusing, and that "[w]hen a court has to guess what issues an Appellant is appealing, that is not enough for meaningful review." *See Commonwealth v. McCree*, 857 A.2d 188, 192 (Pa. Super. 2004) (internal quotation marks omitted). This trial court respectfully contends that the statement is often unclear, and that this arguably serves as a basis to quash Father's appeal in part or in its entirety.

[3] The General Assembly amended Section 5328(a) on or around June 30, 2025, to take effect on August 29, 2025. Both days of the trial as well as the entry of the Trial Court's Order preceded the effective date of August 29, 2025. Accordingly, the sixteen factors previously in effect are addressed here.

5

determinations. With respect to the custody factors, this trial court weighed § 5328(a)(3), (4), (10), (12), and (14) in Mother's favor. This trial court weighed § 5328(a)(2.1)(b), (8), (11), and (13) in Father's favor. The trial court found § 5328(a)(1), (2), (2.1), (2.1)(a), (5), (6), (7), (9), (15), and (16) to be neutral. (*See* Trial Court Opinion, 7/30/2025, at pp. 37–45.) With respect to the relocation factors, this trial court weighed § 5337(h)(2), (3), (4), (6), and (7) in Mother's favor. This trial court weighed § 5337(h)(5) and (8) in Father's favor. The trial court found § 5337(h)(1), (9), and (10) to be neutral. (*See id.* at pp. 45–50.) The relatively voluminous record amply supports these findings. Although on an annual basis Mother will remain the primary custodial parent, this trial court granted Father primary physical custody during summer break, and required Mother to provide almost all transportation between the residences. (*See* Trial Court Order, 7/30/2025, at pp. 1–6.)

> In reviewing a custody order, [the appellate court's] scope is of the broadest type and [the appellate court's] standard is abuse of discretion. [The appellate court] must accept findings of the trial court that are supported by competent evidence of record, as [the appellate court's] role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, [the appellate court] must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, [the appellate court is] not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. [The appellate court] may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

\* \* \*

> The evidentiary record of a custody appeal will often support a conclusion different than the one reached by the lower court. That the trial court could have found for [the other party] is not a sufficient basis to reverse the court's decision. Deference must be given to the trial court, who viewed the parties, the witnesses, and the evidence firsthand.

*White v. Malecki*, 296 A.3d 1210, 1213, 1215 (Pa. Super. 2023) (quotation omitted).

R.R. 6

6

A custody analysis "is not a scorecard" and any select factors may serve as the motivating force behind a trial court's decision, so long as the trial court gives substantial weighted consideration to the factors that affect a child's safety. *See White v. Malecki*, 296 A.3d 1210, 1214 (Pa. Super. 2023). *See also* 23 Pa. C.S. § 5328 (naming the safety-related factors). The Superior Court has explained that the amount of weight a trial court gives any one factor is almost entirely discretionary. *See M.J.M. v. M.L.G.*, 63 A.3d 331, 339 (Pa. Super. 2013). "The Custody Act requires only that the trial court articulate the reasons for its custody decision . . . there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." *See id.* at 336 (internal citations omitted).

This trial court addressed all factors, noted what weight it gave each factor, and explained which factors motivated its decision. With respect to the custody factors, this trial court explained it put particular emphasis on the factors relating to each parent's involvement in the Children's daily life and completion of parental duties, which favored Mother. *See* 23 Pa. C.S. § 5328(a)(3) & (4). (*See also* Trial Court Opinion, 7/30/2025, at p. 52.) With respect to the relocation factors, this trial court explained it put particular emphasis on the factors relating to the Children's educational development and quality of life, which also favored Mother. *See* 23 Pa. C.S. § 5337(h)(2) & (7). (*See also* Trial Court Opinion, 7/30/2025, at p. 51.) Further, this trial court emphasized its finding that preserving the relationship between Father and the Children was feasible through suitable custody arrangements, and altered the custody arrangement so that Father overall had more overnight custody than he had enjoyed for the previous eighteen months. *See* 23 Pa. C.S. § 5337(h)(3). (*See also* Trial Court Opinion, 7/31/2025, at pp. 53–54.)

R.R. 7

7

At the onset, this trial court notes that what Father really asks on appeal is for the appellate court to re-weigh the evidence—namely, to assign determinative weight to the factors that address Mother alienating the Children from Father, coaching the Children, and refusing to cooperate with Father. "The parties cannot dictate the amount of weight the trial court places on evidence." *A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014) (internal quotation omitted). In any event, the trial court now turns to the *thirty-six* issues raised in Father's Concise Statement.

### 1. The trial court did not commit an error of law or abuse of discretion in weighing the custody factors.

In his first issue raised in his Concise Statement, Father asks:

*Did the trial court commit an error of law and/or abuse of discretion by failing to adequately weigh the custody factors as set forth in 23 Pa. C.S. § 5328(a)(1) through (a)(16)?*

The trial court expressly considered and weighed all sixteen custody factors. (*See* Trial Court Opinion, 7/31/2025, at 37–45.) The amount of weight a trial court gives any one factor is almost entirely discretionary. *See M.J.M.*, 63 A.3d at 339. To the extent Father disagrees with the amount of weight the trial court afforded each factor, "[he] cannot dictate the amount of weight the trial court places on evidence." *See A.V.*, 87 A.3d at 820.

### 2. The trial court did not commit an error of law or abuse of discretion its application of the custody factors.

In his second issue raised in his Concise Statement, Father asks:

*Did the trial court commit an error of law and/or abuse of discretion in its application of the custody factors as set forth in 23 Pa. C.S. § 5328(a)(1) through (a)(16)?*

Although the verb used has switched from "weighed" to "applied," this is the same as Father's first issue. The trial court expressly considered and applied all sixteen custody factors. (*See* Trial Court Opinion, 7/31/2025, at pp. 37–45.) A custody analysis "is not a scorecard" and any select factor(s) may serve as the motivating force behind a trial court's decision. *See White,*

R.R. 8

8

296 A.3d at 1214. To the extent Father believes other factors should have been the motivating force behind the trial court's ultimate decision, again, "[he] cannot dictate the amount of weight the trial court places on evidence." *See A.V.*, 87 A.3d at 820.

### 3. The trial court's decision was not against the weight of the evidence, credible or otherwise.

In his third issue raised in his Concise Statement, Father asks:

*With regard to custody factors was the trial court's decision against the weight of the evidence in contradiction to the bulk of credible evidence?*

This is also functionally the same as Father's first and second issues in that he is asking the appellate court to re-weigh the evidence. The trial court considered all evidence— unsurprisingly, Father identifies no specific piece of evidence that the trial court failed to consider, he just disagrees with how the trial court weighed it. (*See* Trial Court Opinion, 7/31/2025, at pp. 1–36, ¶¶ 1–391.) Yet again, "[he] cannot dictate the amount of weight the trial court places on evidence." *See A.V.*, 87 A.3d at 820.

Most credibility findings the Court made were beneficial to Father: that Mother was not credible in fearing for the safety of the Children when in Father's care, that Father was credible in asserting Mother attempted to turn the Children against him, that Father was credible in stating he never abused the Children, that Father was credible in stating Mother was obstinate, that Father was credible regarding the Children's sudden and unusual request to relocate, and that Father's witness Molineux was credible regarding Mother's hostility. (*See* Trial Court Opinion, 7/31/2025, at pp. 42, 46–48, 51.) But the trial Court also found some of Mother's testimony credible. (*See id.* at pp. 51–52.) And the trial court found as the motivating force for its decision different factors than those implicated by the above findings, as it fully explained its opinion. (*See id.* at pp. 51–54.) A custody analysis "is not a scorecard" and any select factor(s) may serve as the motivating force behind a trial court's decision. *See White*, 296 A.3d at 1214.

9

### 4. The evidence was more than sufficient to support the trial court's decision.

In his fourth issue raised in his Concise Statement, Father asks:

*With regard to the custody factors was the evidence presented by Mother insufficient to support the trial court's decision confirming primary physical custody in Mother?*

The evidence in this matter is voluminous and more than sufficient to support the trial court's decision. On the first day of trial alone, in addition to her testimony, Mother admitted thirty-one exhibits including the lease-to-own contract regarding the home, data on the New Jersey schools, and data on the New Jersey area. (*See* Exs. P-27, P-28, & P-29.) Those exhibits, as well as plenty of testimony it relied on, completely support the factors that this trial court relied on as the motivating force for its decision. (*See* Trial Court Opinion, 7/31/2025, at pp. 51–54. *See also* N.T. 7/16/2024 at pp. 80–90.) Further, it was undisputed that for the eighteen months leading up to the relocation trial, Mother had been the Children's primary custodian. (*See id.* at p. 29, ¶ 314 & pp. 52–53.) Finally, even though the trial court discounted the probative value of the Children's testimony, it found that the Children were close with their Mother and wanted to relocate to New Jersey, a set of circumstances which made it in the best interests of the Children for Mother to have primary physical custody during the school year. (*See id.* at pp. 52–53.)

### 5. The trial court committed no error of law or abuse of discretion in finding that § 5328(a)(3) slightly favored Mother.

In his fifth issue raised in his Concise Statement, Father asks:

*Did the trial court commit an error of law and/or abuse of discretion in finding that 23 Pa. C.S. § 5328(a)(3) slightly favors mother due to the current custody arrangement?*

Again, Father is asking the appellate court to re-weigh evidence. The record is more than adequate to support the trial court's analysis regarding the parental duties performed by each party on behalf of the Children. (*See id.* at p. 40.) Importantly, it was undisputed that for the

R.R. 10

10

eighteen months leading up to the relocation trial, Mother had been the Children's primary custodian and completed parental duties consistent with her award of (temporary) primary custody. (*See id.* at p. 29 ¶ 314 & pp. 52–53.)

6. **The trial court committed no error of law or abuse of discretion in finding that § 5328(a)(4) favored Mother.**

In his sixth issue raised in his Concise Statement, Father asks:

*Did the trial court commit an error of law and/or abuse of discretion in finding that 23 Pa. C.S. § 5328(a)(4) favors mother due to the current custody arrangements?*

Again, Father is asking the appellate court to re-weigh evidence. The record is more than adequate to support the trial court's analysis regarding the need for stability and continuity in the Children's education, family life, and community life. (*See id.* at p. 40.) This relocation matter was unusual in that the Children had spent significant time in the relocating area during their whole lives as well as more often recently, so the Children had established social relationships in New Jersey and were already attending summer camp there. (*See id.*) The Children, although coached, wanted to spend more time in New Jersey. (*See id.* at p. 47.) The trial court could easily find that sending the Children back to Pennsylvania half the time could serve as a significant disruption to the stability and continuity in their lives, and it did. (*See id.* at p. 40.) The record supports that conclusion.

In its discussion, the trial court acknowledged that by its very nature, granting "a relocation necessitates some discontinuity in the Children's education and community life." (*See id.* at p. 54.) Implicit in this acknowledgement was this trial court's understanding that the impact of its decision would involve a change in the Children's schools as well as some of their sports teams. (*See id.*) But this trial court ultimately found that it could maintain the children's ties to the non-relocating community and that in any event, this factor was "not controlling" in its final decision. (*See id.*) In wishing the Court considered the disruption to their lives different or

11

assigned controlling weight to this factor, it bears repeating that "[Father] cannot dictate the amount of weight the trial court places on evidence." *See A.V.*, 87 A.3d at 820.

7. **The trial court committed no error of law or abuse of discretion in finding that § 5328(a)(10) favored Mother.**

In his seventh issue raised in his Concise Statement, Father asks:

*Did the trial court commit an error of law and/or abuse of discretion in finding that 23 Pa. C.S. § 5328(a)(10) slightly favors Mother due to the current custody arrangements?*

Again, Father is asking the appellate court to re-weigh evidence. The record is more than adequate to support the trial court's analysis regarding which party is more likely to attend to the daily physical, emotional, developmental, and special needs of the Children. (*See* Trial Court Opinion, 7/31/2025, at pp. 43, 52–53.) Again, it was undisputed that for the eighteen months leading up to the relocation trial, Mother had been the Children's primary custodian and completed parental duties consistent with her award of (temporary) primary custody. (*See id.* at p. 29 ¶ 314 & pp. 52–53.) The Court's finding was also consistent with the findings of the Evaluator, who noted the Children complained of physical discomfort and yelling by Father. (*See id.* at pp. 7–8, ¶¶ 55–60, 64–69.)

8. **The trial court committed no error of law or abuse of discretion in finding that § 5328(a)(12) slightly favored Mother.**

In his eighth issue raised in his Concise Statement, Father asks:

*Did the trial court commit an error of law and/or abuse of discretion in finding that 23 Pa. C.S. § 5328(a)(12) slightly favors Mother due to the current custody arrangements?*

Again, Father is asking the appellate court to re-weigh evidence. The record is more than adequate to support the trial court's analysis regarding which party is available to care for the Child. (*See id.* at p. 44.) Again, it was undisputed that for the eighteen months leading up to the relocation trial, Mother had been the Children's primary caretaker consistent with her award of (temporary) primary custody. (*See id.* at p. 29 ¶ 314 & pp. 52–53.) And even if the trial court

R.R. 12

12

had committed an error of law or abuse of discretion regarding § 5328(a)(12) (it did not), as the trial court explained, this factor is not one that served as a motivating force for its ultimate decision. (*See id.* at pp. 51–54.)

9. **The trial court did not give Mother undue consideration or credit, it simply determined what was in the best interests of the Children.**

In his ninth issue raised in his Concise Statement, Father asks:

> *Did the trial court commit an error of law and/or abuse of discretion in giving Mother undue consideration and/or credit for the previous four factors as Mother manipulated and/or took unfair advantage of the judicial process in improperly obtaining primary physical custody of the minor children and then being able to retain primary physical custody of the minor children for approximately two (2) years as the parties awaited the conclusion of the custody trial?*

Father not only mischaracterizes the trial court's findings, but he also essentially seeks to replace the well-established standard that "the paramount concern of the trial court is the best interest of the child" with another more focused on tallying the actions between the parties. *See A.V.*, 87 A.3d at 820. Initially, the trial court never found that Mother manipulated or took unfair advantage of the judicial process or that she improperly obtained primary custody. But even if it had (it did not), such findings would not have precluded the trial court from granting the request for relocation or awarding primary physical custody to Mother. The trial court is tasked with determining what is in the best interest of the children, plain and simple. Father seems to want to replace this standard with another more focused on a parent versus parent standard. This is not the legal reality. *See id.*

Further, the trial court did not give undue consideration or credit to Mother in its analysis of § 5328(a)(3), (4), (10), or (12). The trial court simply acknowledged the undisputed fact that Mother had been the Children's primary caretaker for about the last eighteen months. (*See* Trial Court Opinion, 7/31/2025, at pp. 52–53.) And to be sure, in considering those factors, the trial court did not exclusively rely on the fact of the preexisting legal arrangement in reaching its

13

conclusion. The Children appeared to be in good health and well-cared-for during their discussion with the trial court. The trial court noted that the Children did not express any upset or reservations in their current arrangement and was therefore able to conclude that the arrangement was working well. (*See id.* at 52.) It observed that the Children were close with their Mother. (*See id.*)

The trial court further notes that in cherry-picking § 5328(a)(3), (4), (10), and (12), Father ignores the particular emphasis the trial court placed on at least three other factors that guided its decision. (*See id.* at pp. 51–56.) The trial court did not even put particular emphasis on three of Father's four cherry-picked factors. (*See id.*) A custody analysis "is not a scorecard" and any select factor(s) may serve as the motivating force behind a trial court's decision. *See White*, 296 A.3d at 1214. To the extent Father believes the trial court got these cherry-picked factors wrong, and that the "corrected" factors should motivate changing the trial court's ultimate decision, he is incorrect. Again, "[he] cannot dictate the amount of weight the trial court places on evidence." *See A.V.*, 87 A.3d at 820.

10. <u>The trial court did not commit any error of law or abuse of discretion in finding that § 5328(a)(14) slightly favored Mother given Father's reticence in taking the hair follicle test as well as the ample record evidence suggesting Father at one point may have abused alcohol.</u>

In his tenth issue raised in his Concise Statement, Father asks:

*Did the trial court commit an error of law and/or abuse of discretion in finding that 23 Pa. C.S. § 5328(a)(14) slightly favors Mother because Father waited ninety-seven (97) days before undergoing a court ordered drug and alcohol test without any other credible evidence that Father abuses alcohol or drugs, or that Father has any kind of history of alcohol or drug abuse?*

Again, Father is asking the appellate court to re-weigh evidence, and in so doing completely ignores the ample record evidence supporting a conclusion that Father may at one point have abused alcohol. To be sure, waiting ninety-seven days to take the hair follicle test

R.R. 14

14

alone is a sufficient basis for this trial court to draw the adverse inference that Father waited to take the test because he knew if he took it close in time to the court order that he would fail. But there was plenty other evidence that could support the conclusion that Father at one point may have abused alcohol. First, Mother's testimony on the issue. Second, photographs Mother took of Father appearing to sleep or be passed out close to containers of alcoholic beverages. Third, testimony from the Children regarding Father's alcohol use. Fourth, the evaluator's observations that Father seemed defensive about his alcohol use. Finally, even Father's own testimony could serve as a basis for reaching this conclusion, as he noted he gives up alcohol for Lent.

11. **The trial court did not commit any error of law or abuse of discretion in awarding Mother primary physical custody despite its determination that Mother was not credible on one specific issue.**

In his eleventh issue raised in his Concise Statement, Father asks:

*Did the trial court commit an error of law and/or abuse of discretion in awarding Mother primary physical custody after making a determination that Mother was not credible and that Father was credible?*

Father is not only asking the appellate court to re-weigh evidence, but he is also mischaracterizing this trial court's findings. The trial court did not make a sweeping proclamation that one parent was 100% credible and the other was not at all. Instead, on select issues where the parties' testimony directly conflicted—namely, involving the safety of the Children and some of the issues regarding Mother's efforts to turn the Children against Father—it opined on which party it found credible and why. Here is the only time the trial court dismissed an aspect of Mother's credibility in its fifty-six-page opinion:

The best interest factors impacting the safety of the Children do not make a significant difference in this matter. *See id.* §§ 5328(a), 5337(h). *To the extent Mother claims otherwise, the Court finds her not credible;* indeed, her proposed final custody order suggests Father should get more physical custody than he currently has.

(*See* Trial Court Opinion, 7/31/2025, at p. 51 (emphasis added).) The trial court then went on to specifically credit Mother's testimony on other issues, particularly those that served as the motivating force for its decision:

> The concededly odd circumstances of the single-family home available to Mother in the relocating area is unique and not transferable, and the Court credits Mother's testimony and the inferences that she would not otherwise be able to afford real estate at the price point of the relocating home. . . . The Court also credits her testimony that there are some unique educational or professional opportunities available in the relocation area that will provide her with unique professional and potential financial opportunities.

(*See id.* at 51–52 (citing 23 Pa. C.S. § 5337(h)(2), (6), & (7)).) In addition to mischaracterizing the trial court's findings, Father seeks to have the appellate court either credit different testimony, which is squarely within the province of the trial court to do, or weigh the factors differently and thereby reach a different conclusion. But "[Father] cannot dictate the amount of weight the trial court places on evidence." *See A.V.*, 87 A.3d at 820.

12. **The trial court did not commit any error of law or abuse of discretion in awarding Mother primary physical custody despite its determination that Mother coached the Children.**

In his twelfth issue raised in his Concise Statement, Father asks:

*Did the trial court commit an error of law and/or abuse of discretion in awarding Mother primary physical custody after making a determination that Mother had improperly coached the minor children?*

Father is again asking the appellate court to either re-weigh evidence or assign dispositive weight to a certain factor or factors, which of course the law does not require a trial court to do. The trial court determined the factors involving the Children's preferences were of limited probative value due to the coaching, and determined from a consideration of all factors what was in the best interest of the Children. (*See* Trial Court Opinion, 7/31/2025, at pp. 41–42, 47, 52–53.) Effectively, because this trial court did find that there was coaching and improper influence

R.R. 16

16

by Mother, Father wants the trial court to assign determinative weight to the factors that involve that finding and reach a different conclusion. But a custody analysis "is not a scorecard" and any select factor(s) may serve as the motivating force behind a trial court's decision. *See White*, 296 A.3d at 1214. To the extent Father believes other factors should have been the motivating force behind the trial court's ultimate decision, again, "[he] cannot dictate the amount of weight the trial court places on evidence." *See A.V.*, 87 A.3d at 820.

13. **The trial court did not commit any error of law or abuse of discretion in awarding Mother primary physical custody despite its determination that Mother had undermined Father's relationship with the Children.**

In his thirteenth issue raised in his Concise Statement, Father asks:

*Did the trial court commit an error of law and/or abuse of discretion in awarding Mother primary physical custody after making a determination that Mother has a history of thwarting Father's relationship with the children?*

In an issue that is almost identical to issue twelve, Father is again asking the appellate court to either re-weigh evidence or assign dispositive weight to a certain factor or factors, which of course the law does not require a trial court to do. The trial court did find that Mother had engaged in conduct that undermined the relationship of Children and Father. (*See* Trial Court Opinion, 7/31/2025, at pp. 41–42, 47–48.) Accordingly, the trial court, despite the Children's testimony, assigned no weight to the preference of the children with respect to which parent should have primary custody, and minimal weight to the preference of the children with respect to whether relocation was in the best interest of the Children. *See id.* at pp. 41–42, 47. And it weighed those factors involving that factual finding, namely § 5328(a)(8) & (13) and § 5337(h)(5) and (8) in Father's favor. (*See id.* at pp. 42, 44, 47–50.) The trial court just emphasized different factors in making its ultimate determination. (*See id.* at pp. 51–56.) A custody analysis "is not a scorecard" and any select factor(s) may serve as the motivating force behind a trial court's decision. *See White*, 296 A.3d at 1214. To the extent Father believes other

17

factors should have been the motivating force behind the trial court's ultimate decision, again, "[he] cannot dictate the amount of weight the trial court places on evidence." *See A.V.*, 87 A.3d at 820.

14. **The trial court did not commit any error of law or abuse of discretion in awarding Mother primary physical custody despite its determination that Mother had alienated Father from the Children.**

In his fourteenth issue raised in his Concise Statement, Father asks:

*Did the trial court commit an error of law and/or abuse of discretion in awarding Mother primary physical custody after making a determination that Mother alienated the minor children against Father and their community?*

In an issue that is almost identical to issues twelve and thirteen, Father is again asking the appellate court to either re-weigh evidence or assign dispositive weight to a certain factor or factors, which of course the law does not require a trial court to do. The trial court did highlight and credit Father's testimony involving Mother's acts of alienation. (*See* Trial Court Opinion, 7/31/2025, at pp. 47, 57.) Accordingly, the trial court weighed those factors involving that factual finding, namely § 5328(a)(8) & (13) and § 5337(h)(5) and (8), in Father's favor. (*See id.* at pp. 42, 44, 47–50.) The trial court just emphasized different factors in making its ultimate determination. (*See id.* at pp. 51–56.) A custody analysis "is not a scorecard" and any select factor(s) may serve as the motivating force behind a trial court's decision. *See White*, 296 A.3d at 1214. To the extent Father believes other factors should have been the motivating force behind the trial court's ultimate decision, again, "[he] cannot dictate the amount of weight the trial court places on evidence." *See A.V.*, 87 A.3d at 820.

15. **The trial court did not commit any error of law or abuse of discretion in awarding Mother primary physical custody despite its determination that Father was the parent more likely to cooperate as well as encourage contact between the Children and the other parent.**

In his fifteenth issue raised in his Concise Statement, Father asks:

R.R. 18

18

*Did the trial court commit an error of law and/or abuse of discretion in awarding Mother primary physical custody after making a determination that Mother refuses to cooperate and co-parent with Father even when it is more convenient and in the best interest of the children to do so, while also making a determination that Father is more likely to encourage and permit contact between the children and Mother?*

In an issue that is quite like issues twelve through fourteen, Father is again asking the appellate court to either re-weigh evidence or assign dispositive weight to a certain factor or factors, which of course the law does not require a trial court to do. The trial court did find that § 5328(a)(8) & (13) favored Father, and weighed them in Father's favor. (*See* Trial Court Opinion, 7/31/2025, at pp. 42, 44.) The trial court just emphasized different factors in making its ultimate determination. (*See id.* at pp. 51–56.) A custody analysis "is not a scorecard" and any select factor(s) may serve as the motivating force behind a trial court's decision. *See White*, 296 A.3d at 1214. To the extent Father believes other factors should have been the motivating force behind the trial court's ultimate decision, again, "[he] cannot dictate the amount of weight the trial court places on evidence." *See A.V.*, 87 A.3d at 820.

16. **The trial court did not commit an error of law or abuse of discretion in weighing the relocation factors.**

In his sixteenth issue raised in his Concise Statement, Father asks:

*Did the trial court commit an error of law and/or abuse of discretion by failing to adequately weigh the relocation factors set forth in 23 Pa. C.S. § 5337(h)(1) through (h)(10)?*

The trial court expressly considered and weighed all ten relocation factors. (*See* Trial Court Opinion, 7/31/2025, at pp. 45–50.) The amount of weight a trial court gives any one factor is almost entirely discretionary. *See M.J.M.*, 63 A.3d at 339. To the extent Father disagrees with the amount of weight the trial court afforded each factor, "[he] cannot dictate the amount of weight the trial court places on evidence." *See A.V.*, 87 A.3d at 820.

R.R. 19

19

## 17. The trial court did not commit an error of law or abuse of discretion its application of the relocation factors.

In his seventeenth issue raised in his Concise Statement, Father asks:

*Did the trial court commit an error of law and/or abuse of discretion in its application of the relocation factors as set forth in 23 Pa. C.S. § 5337(h)(1) through (10)?*

Although the verb used has switched from "weighed" to "applied," this is the same as Father's sixteenth issue. The trial court expressly considered and weighed all ten relocation factors. (*See* Trial Court Opinion, 7/31/2025, at pp. 45–50.) The amount of weight a trial court gives any one factor is almost entirely discretionary. *See M.J.M.*, 63 A.3d at 339. To the extent Father disagrees with the amount of weight the trial court afforded each factor, again, "[he] cannot dictate the amount of weight the trial court places on evidence." *See A.V.*, 87 A.3d at 820.

## 18. The trial court's decision was not against the weight of the evidence, credible or otherwise.

In his eighteenth issue raised in his Concise Statement, Father asks:

*With regard to the relocation factors was the trial court's decision against the weight of evidence in contradiction to the bulk of credible evidence?*

This is also functionally the same as Father's sixteenth and seventeenth issues in that he is asking the appellate court to re-weigh the evidence. The trial court considered all evidence—unsurprisingly, Father identifies no specific piece of evidence that the trial court failed to consider, he just disagrees with how the trial court weighed it. (*See* Trial Court Opinion, 7/31/2025, at pp. 1–36, ¶¶ 1–391.) Yet again, "[he] cannot dictate the amount of weight the trial court places on evidence." *See A.V.*, 87 A.3d at 820. Most credibility findings the Court made were beneficial to Father: that Mother was not credible in fearing for the safety of the Children when in Father's care, that Father was credible in asserting Mother attempted to turn the Children against him, that Father was credible in stating he never abused the Children, that

R.R. 20e

20

Father was credible in stating Mother was obstinate, that Father was credible regarding the Children's sudden and unusual request to relocate, and that Father's witness Molineux was credible regarding Mother's hostility. (*See* Trial Court Opinion, 7/31/2025, at pp. 42, 46–48, 51.) But the trial court also found some of Mother's testimony credible. (*See id.* at pp. 51–52.) And the trial court found as the motivating force for its decision different factors than those implicated by the above findings, as it fully explained its opinion. (*See id.* at pp. 51–54.)

### 19. The trial court's decision was supported by sufficient evidence.

In his nineteenth issue raised in his Concise Statement, Father asks:

*With regard to the relocation factors was the evidence presented by Mother insufficient to support the trial court's decision granting relocation for Mother?*

The evidence in this matter is voluminous and more than sufficient to support the trial court's decision. On the first day of trial alone, in addition to her testimony, Mother admitted thirty-one exhibits including the lease-to-own contract regarding the home, data on the New Jersey schools, and data on the New Jersey area. (*See* Exs. P-27, P-28, & P-29.) Those exhibits, as well as plenty of testimony from Mother that the trial court considered, completely support the factors that this trial court relied on as the motivating force for its decision. (*See* Trial Court Opinion, 7/31/2025, at pp. 51–54.) (*See also* N.T. 7/16/2024 at pp. 80–90 (testifying about the schools and area).) Further, it was undisputed that for the eighteen months leading up to the relocation trial, Mother had been the Children's primary custodian. (*See* Trial Court Opinion, 7/31/2025, at p. 29, ¶ 314 & pp. 52–53.) Finally, even though the trial court discounted the probative value of the Children's testimony, it found that the Children were close with their Mother and wanted to relocate to New Jersey, a set of circumstances which made it in the best interests of the Children for Mother to have primary physical custody during the school year. (*See id.* at pp. 52–53.)

<strong>R.R. 21</strong>

**20. The trial court did not commit an error of law or abuse of discretion regarding various factual findings as they relate to the relocation factors, all of which are supported by the record.**

In his twentieth issue raised in his Concise Statement, Father asks:

*Did the trial court commit an error of law and/or abuse of discretion in finding that 23 Pa. C.S. § 5337(h)(2) and (h)(6) and (h)(7) favors Mother for the following reasons: (a) that one of the children has a learning disability; (b) the condition of the marital home versus the condition of the property located in New Jersey; (c) the fact that Mother is earning Nine Thousand Dollars ($9,000.00) more in New Jersey and has the ability to become an administrator; (d) Mother has extended family in New Jersey; and (e) the quality of education offered in Bergen County?*

All these findings are supported by the record and have an intelligible nexus to the factors the Court is required to consider. The trial court notes that none of these findings were dispositive or a but-for factor in its analysis and eventual decision. The trial court further again notes that it is not entirely clear on what precisely Father is appealing here, and that "[w]hen a court has to guess what issues an Appellant is appealing, that is not enough for meaningful review." *See Commonwealth v. McCree*, 857 A.2d 188, 192 (Pa. Super. 2004) (internal quotation marks omitted). That said, the trial court will try to address each in turn.

### (a) that one of the children has a learning disability

"Mother testified that one of the Children has a learning disability in the area of reading and qualifies for special education." (*See* Trial Court Opinion, 7/31/2025, at 20, ¶ 193.) The trial court notes that on the first day of testimony, Mother indicated that none of the Children had special needs, but this factual circumstance had changed by the second day of testimony. (*See* N.T. 7/16/2024 at p. 101.) The trial court's finding is supported almost verbatim from the record. Are the Child's present special needs even in dispute? To the extent that they are, the trial Court expressly credits Mother's testimony on this point:

R.R. 22

22

[Mr. Clark:]   Okay. All right. And then just the last topic in the vein of legal, custody, cooperation, things of that nature. Do any of the children as far as you know, have special needs?

[Mother:]   [J.D.] was just identified as having a specific learning disability in the basic area of reading.

\* \* \*

[Mr. Clark]:   Correct. Yeah. So you requested it previously then the school recommended it. Correct?

[Mother]:   Yes, that was requested, yes.

[Mr. Clark]:   Yes. So the IEP evaluation was done, do you recall what it came back with?

[Mother]:   Yes. He was identified as having a specific learning disability in the basic area of reading. And he qualifies for special education.

[Mr. Clark]:   All right. And so what did you want to do then based upon that?

[Mother]:   I wanted to register him in a public School District to get an IEP written.

(*See* N.T. 7/10/2024 at p. 101.) Section 5337(h)(2) by its terms specifically directs trial courts to take into consideration any special needs of the children, and it did so. (*See* Trial Court Opinion, 7/31/2025, at 45–46.) Father has this issue turned upside down: for the trial court to have *not* considered that one of the Children has a learning disability might have been an error of law or abuse of discretion. The finding, in connection with the trial court's findings regarding the quality of schools in the relocating county, *see supra*, is supported by the record. He just, again, wants the appellate court to re-weigh the evidence and reach a different conclusion. *See A.V.*, 87 A.3d at 820.

### (b) the condition of the marital home versus the condition of the property located in New Jersey

There was ample record evidence to support this finding as well. The Evaluator, who viewed both homes, reported that the marital home was in fair to poor condition and that the marital home did not appear to follow City/State regulations, and that Mother's prospective four-

R.R. 23

23

bedroom, three-bathroom single family home in Waldwick, New Jersey, was in excellent condition. (*See* Ex. C-1 at 9–10.) He further testified to that effect. (*See* N.T. 7/10/2024, at pp. 78–81.) Mother testified to that effect. (*See* N.T. 7/16/2024 at 104–11.) Of course, this Court is permitted to find that living in a nice home in a nice neighborhood that Mother could not otherwise afford would enhance the Children's quality of life as well as have a positive emotional impact on the Children. (*See* Trial Court Opinion, 7/31/2025, at 45-46, 49.) Father just, again, wants the appellate court to re-weigh the evidence and reach a different conclusion. *See A.V.*, 87 A.3d at 820.

### (c) the fact that Mother is earning Nine Thousand Dollars ($9,000.00) more in New Jersey and has the ability to become an administrator

There was ample record evidence to support this finding as well. As to the salary, Mother testified to this fact. (*See* N.T. 7/16/2024, at p. 78.) Exhibits were introduced to corroborate her testimony. (*See* Ex. P-27.) As to the ability to become an administrator, Mother testified to this effect, explaining the opportunities available in New Jersey and testifying that she was not presented with the same sort of opportunity while working in Delaware County, Pennsylvania. (*See* N.T. 7/10/2025, at p. 144–45.) Knowing the parties disagreed on this point, the trial court expressly credited Mother's testimony on this issue, stating "[t]he [c]ourt also credits [Mother's] testimony that there are some unique educational or professional opportunities available in the relocation area that will provide her with unique professional and potential financial opportunities." (*See* Trial Court Opinion, 7/31/2025, at 51–52.) It is well-established that "with regard to issues of credibility and weight of the evidence, [the appellate court] must defer to the presiding trial judge who viewed and assessed the witnesses first-hand." *See White*, 296 A.3d at 1213. And of course, because financial benefit and educational opportunity to the relocating party are specifically listed in § 5337(h)(7), considering Mother's higher salary and

R.R. 24

24

increased opportunities in its analysis was entirely appropriate. (*See* Trial Court Opinion, 7/31/2025, at 48–49.)

### (d) Mother has extended family in New Jersey

Again, the trial court was not even clear that the parties disagreed on this point—indeed, Father's position was that Mother had significant ties to Pennsylvania, but is it truly contested that Mother has extended family members in New Jersey? In any event, there was ample record evidence to support this finding. Mother testified to this effect. (*See* N.T. 7/16/2024 at pp. 12–13.) Section 5328(a)(5) requires that the Court consider this type of information. (*See* Trial Court Opinion, 7/31/2025, at 41.) The trial court in no way abused its discretion by finding that being close to maternal family members could have a positive emotional benefit on the Children's emotional development as well as Mother's under § 5337(h)(2) and (h)(6). (*See* Trial Court Opinion, 7/31/2025, at 45–46, 48.) Father just, again, wants the appellate court to re-weigh the evidence and reach a different conclusion. *See A.V.*, 87 A.3d at 820.

### (e) the quality of education offered in Bergen County

There was ample record evidence to support this finding as well. Mother testified to this effect. (*See* N.T. 7/16/2024, at pp. 80–90.) Exhibits were introduced to the same effect. (*See* Ex. P-29.) The trial court is expressly required to consider the impact a relocation will have on the children's educational development and any potential educational opportunities under § 5337(h)(2) and (6). Father also has this issue turned upside down: for the trial court to have *not* considered the quality of education offered in Bergen County, New Jersey might have been an error of law or abuse of discretion. He just, again, wants the appellate court to re-weigh the evidence and reach a different conclusion. *See A.V.*, 87 A.3d at 820.

**21. The trial court did not commit an error of law and/or abuse of discretion in awarding relocation because there was credible evidence regarding the Child's learning disability as well as the quality of education in the relocating county.**

In his twenty-first issue raised in his Concise Statement, Father asks:

*Did the trial court commit an error of law and/or abuse of discretion in awarding Mother relocation where Mother could not produce any credible evidence that one of the children has a learning disability or that New Jersey offers a better quality of education than Pennsylvania?*

This appears to be the same as issue number twenty. There was ample record evidence to support these conclusions. The trial court notes that none of these findings were dispositive or a but-for factor in its analysis and eventual decision. That said, regarding the learning disability, the trial court refers to its previous explanation, *supra* at pp. 21–22, and regarding the quality of education in the relocating county, the trial court refers to its previous explanation, *supra* at p. 24.

**22. The trial court did not commit an error of law and/or abuse of discretion in awarding relocation in relation to the marital home or residence in New Jersey.**

In his twenty-second issue raised in his Concise Statement, Father asks:

*Did the trial court commit an error of law and/or abuse of discretion in awarding Mother relocation where the trial court determined that Mother actually caused the condition of the marital home and then lied about the circumstances in obtaining her new residence in New Jersey?*

Father is not only asking the appellate court to re-weigh evidence, but he is also mischaracterizing this trial court's findings. The trial court made no finding that Mother caused the condition of the marital home. The trial court noted, per the Evaluator, that *Father believed* Mother caused the condition of the marital home. (*See* Trial Court Opinion, 7/31/2025, at p. 9 ¶ 81.) To the extent the trial court relied on this fact in its analysis, it opined only that the relocation residence was in excellent condition and that the marital home was in poor to fair condition—it did not indicate who if anyone caused the condition. (*See id.* at p. 46.) This is

**R.R. 26**

26

because who (if anyone) caused the condition of the marital home was of almost no probative value with respect to whether relocation was best for the Children, so the trial court spent almost no time on it. (*See id.* at 37–56.)

And where did the trial court state that Mother lied about the circumstances in obtaining her new residence? It noted the evaluator thought the real estate transaction was odd. (*See id.* at p. 11 ¶ 97.) The trial court agreed it was "concededly odd" but in no way went as far in its fact-finding as Father states. (*See id.* at p. 51.) Father apparently wants the appellate court to find these facts and apparently assign them great weight, and in so doing impermissibly asks the appellate court to not only fact find, but also re-weigh the evidence and reach a different conclusion. *See A.V.*, 87 A.3d at 820. This is the province of the trial court. *See id.*

23. <u>The trial court did not commit an error of law and/or abuse of discretion in awarding relocation despite an alleged lack of "significant" increase in salary, medical benefits, and/or job security.</u>

In his twenty-third issue raised in his Concise Statement, Father asks:

> *Did the trial court commit an error of law and/or abuse of discretion in awarding Mother relocation where Mother could not produce any credible evidence that her new employment provides a significant increase in salary, medical benefits, and/or job security?*

Father is again asking the appellate court to re-weigh evidence as well as apparently requiring select evidence that the statute does not require. Mother was not required to produce any evidence that new employment associated with her relocation would provide a significant increase in her salary (query if a $9,000 increase in salary is per se insignificant), medical benefits, or job security. She needed to prove that the relocation was in the best interests of the Children using the child custody and relocation factors—which she did. (*See* Trial Court Opinion, 7/31/2025, at pp. 37–56.) A custody analysis "is not a scorecard" and any select factor(s) may serve as the motivating force behind a trial court's decision. *See White*, 296 A.3d

at 1214. To the extent Father believes other factors should have been the motivating force behind the trial court's ultimate decision, again, "[he] cannot dictate the amount of weight the trial court places on evidence." *See A.V.*, 87 A.3d at 820.

24. **The trial court did not commit an error of law and/or abuse of discretion in awarding relocation despite Mother having lived a majority of her life in Pennsylvania.**

In his twenty-fourth issue raised in his Concise Statement, Father asks:

*Did the trial court commit an error of law and/or abuse of discretion in awarding Mother relocation based on Mother's extended family living in New Jersey despite the fact that Mother has lived a majority of her life in Pennsylvania?*

Father is again asking the appellate court to re-weigh evidence as well as apparently assign dispositive weight to the fact that Mother lived a majority of her life in Pennsylvania. Importantly, the trial court weighed both facts in its decision, it simply assigned these facts in connection with the other evidence a level of weight with which Father disagrees. (*See* Trial Court Opinion, 7/31/2025, at pp. 50–56.) A custody analysis "is not a scorecard" and any select factor(s) may serve as the motivating force behind a trial court's decision. *See White*, 296 A.3d at 1214. To the extent Father believes other factors should have been the motivating force behind the trial court's ultimate decision, again, "[he] cannot dictate the amount of weight the trial court places on evidence." *See A.V.*, 87 A.3d at 820.

25. **The trial court did not commit an error of law and/or abuse of discretion in its § 5337(h)(3) analysis.**

In his twenty-fifth issue raised in his Concise Statement, Father asks:

*Did the trial court commit an error of law and/or abuse of discretion in finding that 23 Pa. C.S. § 5337(h)(3) favors Mother where the only rationale is that Mother has a unique opportunity to purchase the proposed relocation residence even though the trial court found that Mother misrepresented and/or lied concerning the circumstances involving the opportunity to make this purchase?*

Father is again asking the appellate court to re-weigh evidence as well as mischaracterizing the trial court's findings. Where did the trial court state that Mother misrepresented and/or lied about the circumstances in making this purchase? It noted the evaluator thought the real estate transaction was odd. (*See* Trial Court Opinion, 7/31/2025, at p. 11 ¶ 97.) The trial court agreed it was "concededly odd" but in no way went as far in its fact-finding as Father states. (*See id.* at p. 51.) Father appears to want the appellate court to both find these facts and assign them great weight, and in so doing impermissibly asks the appellate court to not only fact find, but also re-weigh the evidence and reach a different conclusion. *See A.V.*, 87 A.3d at 820. This is the province of the trial court. *See id.* Further, characterizing this fact as the trial court's "only rationale" is just plain wrong, its analysis of § 5337(h)(3) speaks for itself. (*See* Trial Court Opinion, 7/31/2025, at pp. 46–47.)

26. **The trial court did not commit an error of law and/or abuse of discretion in its § 5337(h)(4) analysis.**

In his twenty-sixth issue raised in his Concise Statement, Father asks:

*Did the trial court commit an error of law and/or abuse of discretion by failing to adequately weigh the relocation factors set forth in 23 Pa. C.S. § 5337(h)(4) where the trial court specifically found coaching and alienation?*

Again, Father is asking the appellate court to either re-weigh evidence and reverse the trial court's credibility determinations. The trial court did highlight and credit Father's testimony involving Mother's acts of alienation and potential coaching. (*See* Trial Court Opinion, 7/31/2025, at pp. 47, 57.) Accordingly, the trial court assigned § 5328(a)(7), the preference of the Children between their parents, no weight. (*See id.* at pp. 41–42.) The trial court assigned § 5337(h)(4), the preference of the Children regarding relocation, little weight in favor of Mother. (*See id.* at p. 47.) The trial court stated, "the Children did appear coached by Mother, particularly with respect to their desire to relocate as expressed in a manner uncharacteristic for

R.R. 29

29

their respective ages and maturity. Nevertheless, the Children do seem to possess some desire to relocate to New Jersey despite the limited probative value of their testimony." (*See id.*) It is well-established that "with regard to issues of credibility and weight of the evidence, [the appellate court] must defer to the presiding trial judge who viewed and assessed the witnesses first-hand." *See White*, 296 A.3d at 1213. To the extent Father believes that fact should have been the motivating force behind the trial court's ultimate decision, again, "[he] cannot dictate the amount of weight the trial court places on evidence." *See A.V.*, 87 A.3d at 820.

27. **The trial court did not commit an error of law and/or abuse of discretion in its § 5337(h)(6) analysis.**

In his twenty-seventh issue raised in his Concise Statement, Father asks:

*Did the trial court commit an error of law and/or abuse of discretion by failing to adequately weigh the relocation factors set forth in 23 Pa. C.S. § 5337(h)(6)?*

Father is again asking the appellate court to re-weigh evidence. The trial court's § 5337(h)(6) findings are well-supported by the record and sensible. (*See* Trial Court Opinion, 7/31/2025, at pp. 48–49.) A custody analysis "is not a scorecard" and any select factor(s) may serve as the motivating force behind a trial court's decision. *See White*, 296 A.3d at 1214. To the extent Father believes other factors should have been the motivating force behind the trial court's ultimate decision, again, "[he] cannot dictate the amount of weight the trial court places on evidence." *See A.V.*, 87 A.3d at 820.

28. **The trial court did not commit an error of law and/or abuse of discretion in its award of relocation despite its select credibility determinations.**

In his twenty-eighth issue raised in his Concise Statement, Father asks:

*Did the trial court commit an error of law and/or abuse of discretion in awarding Mother relocation after making a determination that Mother was not credible and that Father was credible?*

R.R. 30

30

In an issue very like issue eleven, Father is not only asking the appellate court to re-weigh evidence, but he is also mischaracterizing this trial court's findings. The trial court did not make a sweeping proclamation that one parent was 100% credible and the other was not at all. Instead, on select issues where the parties' testimony directly conflicted—namely, involving the safety of the Children and some of the issues regarding Mother's efforts to turn the Children against Father—it opined on which party it found credible and why. Here is the only time the trial court dismissed an aspect of Mother's credibility in its fifty-six-page opinion:

> The best interest factors impacting the safety of the Children do not make a significant difference in this matter. *See id.* §§ 5328(a), 5337(h). ***To the extent Mother claims otherwise, the Court finds her not credible***; indeed, her proposed final custody order suggests Father should get more physical custody than he currently has.

(*See* Trial Court Opinion, 7/31/2025, at p. 51 (emphasis added).) The trial court then went on to specifically credit Mother's testimony on other issues, particularly those that served as the motivating force for its decision:

> The concededly odd circumstances of the single-family home available to Mother in the relocating area is unique and not transferable, and the Court credits Mother's testimony and the inferences that she would not otherwise be able to afford real estate at the price point of the relocating home. . . . The Court also credits her testimony that there are some unique educational or professional opportunities available in the relocation area that will provide her with unique professional and potential financial opportunities.

(*See id.* at 51–52 (citing 23 Pa. C.S. § 5337(h)(2), (6), & (7).) In addition to mischaracterizing the trial court's findings, Father seeks to have the appellate court either credit different testimony (which is squarely within the province of the trial court to do), or weigh the factors differently and thereby reach a different conclusion. But "[Father] cannot dictate the amount of weight the trial court places on evidence." *See A.V.*, 87 A.3d at 820.

## 29. The trial court did not commit an error of law and/or abuse of discretion in its award of relocation despite its finding of some coaching.

In his twenty-ninth issue raised in his Concise Statement, Father asks:

*Did the trial court commit an error of law and/or abuse of discretion in awarding Mother relocation after making a determination that Mother had improperly coached the minor children?*

In an issue very like issue twelve, Father is again asking the appellate court to either re-weigh evidence or assign dispositive weight to a certain factor or factors, which of course the law does not require a trial court to do. The trial court determined the factors involving the Children's preferences were of limited probative value due to the coaching, and determined from a consideration of all factors what was in the best interest of the Children. (*See* Trial Court Opinion, 7/30/2025, at pp. 41–42, 47, 52–53.) Effectively, because this trial court did find that there was coaching and improper influence by Mother, Father wants the trial court to assign determinative weight to the factors that involve that finding and reach a different conclusion. But a custody analysis "is not a scorecard" and any select factor(s) may serve as the motivating force behind a trial court's decision. *See White*, 296 A.3d at 1214. To the extent Father believes other factors should have been the motivating force behind the trial court's ultimate decision, again, "[he] cannot dictate the amount of weight the trial court places on evidence." *See A.V.*, 87 A.3d at 820.

## 30. The trial court did not commit an error of law and/or abuse of discretion in its award of relocation despite its finding that Mother undermined the relationship between Father and the Children.

In his thirtieth issue raised in his Concise Statement, Father asks:

*Did the trial court commit an error of law and/or abuse of discretion in awarding Mother relocation after making a determination that Mother has a history of thwarting Father's relationship with the children?*

In an issue very like issues thirteen and twenty-nine, Father is again asking the appellate court to either re-weigh evidence or assign dispositive weight to a certain factor or factors, which of course the law does not require a trial court to do. The trial court determined "Mother has engaged in an established pattern of conduct to undermine the relationship of the Children and Father" and weighed the factors affected by that finding accordingly. (*See* Trial Court Opinion, 7/31/2025, at pp. 39, 42, 44, 47–48.) Effectively, because this trial court did find that there was conduct by Mother undermining the Children's relationship with their father, Father wants the trial court to assign determinative weight to the factors that involve that finding and reach a different conclusion. But a custody analysis "is not a scorecard" and any select factor(s) may serve as the motivating force behind a trial court's decision. *See White*, 296 A.3d at 1214. To the extent Father believes other factors should have been the motivating force behind the trial court's ultimate decision, again, "[he] cannot dictate the amount of weight the trial court places on evidence." *See A.V.*, 87 A.3d at 820.

31. <u>**The trial court did not commit an error of law and/or abuse of discretion in its award of relocation despite its finding of some alienation.**</u>

In his thirty-first issue raised in his Concise Statement, Father asks:

*Did the trial court commit an error of law and/or abuse of discretion in awarding Mother relocation after making a determination that Mother alienated the minor children against Father and their community?*

In an issue very like issue fourteen, Father is again asking the appellate court to either re-weigh evidence or assign dispositive weight to a certain factor or factors, which of course the law does not require a trial court to do. The trial court did highlight and credit Father's testimony involving Mother's acts of alienation. (*See* Trial Court Opinion, 7/31/2025, at pp. 47, 57.) Accordingly, the trial court weighed those factors involving that factual finding, namely § 5328(a)(8) & (13) and § 5337(h)(5) and (8), in Father's favor. (*See id.* at pp. 42, 44, 47–50.)

R.R. 33

33

The trial court just emphasized different factors in making its ultimate determination. (*See id.* at pp. 51–56.) A custody analysis "is not a scorecard" and any select factor(s) may serve as the motivating force behind a trial court's decision. *See White*, 296 A.3d at 1214. To the extent Father believes other factors should have been the motivating force behind the trial court's ultimate decision, again, "[he] cannot dictate the amount of weight the trial court places on evidence." *See A.V.*, 87 A.3d at 820.

32. **The trial court did not commit an error of law and/or abuse of discretion in its award of relocation despite its finding that Mother was uncooperative and Father was more likely to encourage and permit contact between the Children and Mother.**

In his thirty-second issue raised in his Concise Statement, Father asks:

*Did the trial court commit an error of law and/or abuse of discretion in awarding Mother relocation after making a determination that Mother refuses to cooperate and co-parent with Father even when it is more convenient and in the best interest of the children to do so, while also making a determination that Father is more likely to encourage and permit contract between the children and Mother?*

Father is again asking the appellate court to either re-weigh evidence or assign dispositive weight to a certain factor or factors, which of course the law does not require a trial court to do. The trial court did find that § 5328(a)(8) & (13) as well as § 5337(h)(5) favored Father, and weighed them in Father's favor. (*See* Trial Court Opinion, 7/31/2025, at pp. 42, 44, 47-48.) The trial court just emphasized different factors in making its ultimate determination. (*See id.* at pp. 51–56.) A custody analysis "is not a scorecard" and any select factor(s) may serve as the motivating force behind a trial court's decision. *See White*, 296 A.3d at 1214. To the extent Father believes other factors should have been the motivating force behind the trial court's ultimate decision, again, "[he] cannot dictate the amount of weight the trial court places on evidence." *See A.V.*, 87 A.3d at 820.

R.R. 34

34

## 33. The trial court did not commit an error of law and/or abuse of discretion in considering Mother's conduct.

In his thirty-third issue raised in his Concise Statement, Father asks:

*Given Mother's history and the evidence of this case, did the trial court abuse its discretion and/or make an error of law in properly considering Mother's history of failing to act in good faith and attempting to limit Father's custodial time with the children?*

Father is again asking the appellate court to either re-weigh evidence or assign dispositive weight to a certain factor or factors. A custody analysis "is not a scorecard" and any select factor(s) may serve as the motivating force behind a trial court's decision. *See White*, 296 A.3d at 1214. To the extent Father believes other factors should have been the motivating force behind the trial court's ultimate decision, again, "[he] cannot dictate the amount of weight the trial court places on evidence." *See A.V.*, 87 A.3d at 820.

## 34. The trial court did not commit an error of law and/or abuse of discretion in awarding Mother primary physical custody.

In his thirty-fourth issue raised in his Concise Statement, Father asks:

*Did the trial court commit an error of law and/or abuse of discretion in awarding Mother primary physical custody against the weight of evidence, the trial court's credibility determinations, and the trial court's determination of the custody factors?*

Father is again asking the appellate court to either re-weigh evidence or assign dispositive weight to a certain factor or factors. First, the trial court expressly considered and applied all sixteen custody factors. (*See* Trial Court Opinion, 7/31/2025, at 37–45.) Second, the trial court did not make a sweeping proclamation that one parent was 100% credible and the other was not at all. Instead, on select issues where the parties' testimony directly conflicted—namely, involving the safety of the Children and some of the issues regarding Mother's efforts to turn the Children against Father—it opined on which party it found credible and why, at times finding Mother credible and other times finding Mother not to be credible. (*See id.* at 51–52.)

R.R. 35

35

Finally, as to the weight of the evidence, the trial court considered all evidence—unsurprisingly, Father identifies no specific piece of evidence that the trial court failed to consider, he just disagrees with how the trial court weighed it. (*See* Trial Court Opinion, 7/31/2025, at 1–36, ¶¶ 1–391.) Yet again, "[Father] cannot dictate the amount of weight the trial court places on evidence." *See A.V.*, 87 A.3d at 820. Again, a custody analysis "is not a scorecard" and any select factor(s) may serve as the motivating force behind a trial court's decision. *See White*, 296 A.3d at 1214.

## 35. The trial court did not commit an error of law and/or abuse of discretion in granting Mother's request for relocation.

In his thirty-fifth issue raised in his Concise Statement, Father asks:

*Did the trial court commit an error of law and/or abuse of discretion in awarding Mother relocation against the weight of the evidence, the trial court's credibility determinations, and the trial court's determination of the relocation factors?*

Father is again asking the appellate court to either re-weigh evidence or assign dispositive weight to a certain factor or factors. First, the trial court expressly considered and applied all relocation factors. (*See* Trial Court Opinion, 7/31/2025, at 45–50.) Second, the trial court did not make a sweeping proclamation that one parent was 100% credible and the other was not at all. Instead, on select issues where the parties' testimony directly conflicted—namely, involving the safety of the Children and some of the issues regarding Mother's efforts to turn the Children against Father—it opined on which party it found credible and why, at times finding Mother credible and other times finding Mother not to be credible. (*See id.* at 51–52.)

Finally, as to the weight of the evidence, the trial court considered all evidence—unsurprisingly, Father identifies no specific piece of evidence that the trial court failed to consider, he just disagrees with how the trial court weighed it. (*See* Trial Court Opinion, 7/31/2025, at 1–36, ¶¶ 1–391.) Yet again, "[Father] cannot dictate the amount of weight the trial

**R.R. 36**

36

the trial court places on evidence." *See A.V.*, 87 A.3d at 820. Again, a custody analysis "is not a scorecard" and any select factor(s) may serve as the motivating force behind a trial court's decision. *See White*, 296 A.3d at 1214.

### III.   CONCLUSION

This trial court considered the best interests of the Children based on factual findings that are supported by the record and thoroughly addressed every factor. For the foregoing reasons, this trial court respectfully requests that its Final Custody Order be affirmed.

BY THE COURT:

_____

Rachel Ezzell Berry. J.